**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**HAFFENDEN–RIMAR INTERNATIONAL, INC. and Rimar Scotch Whisky Trading Co. et al., Defendants.**

**Civ. A. No. 108–73–A.**

United States District Court, E. D. Virginia, Alexandria Division.

Aug. 8, 1973.

William R. Schief, Lionel E. Pashkoff, John R. Kiefner, Jr., and Lloyd F. Ryan, Jr., Arlington, Va., for plaintiff.

Joseph E. Casey, and Edward F. Canfield, Washington, D. C., for defendants.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

The Securities and Exchange Commission brought this suit to permanently enjoin the defendants from continuing to violate the registration provisions of § 5 of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c); the anti-fraud provisions of § 17(a) of that Act, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78q(a), and Rule 10b–5 promulgated thereunder.

The defendants claim that they have not violated the Act because what they sold is not a security within the meaning and scope of the registration provisions of the Act, 15 U.S.C. § 77b(1).

Jurisdiction to hear and determine the matter is conceded.

The material facts are not in dispute —Most of the evidence was presented by detailed stipulations and exhibits and by an oral deposition—One witness was brought from Scotland, one from England and one from Baltimore.

This suit involves investments in Scotch whiskey.

The defendants admit their active participation in the sales program in question and admit that they were not registered with the Securities and Exchange Commission, and that they did not hold basic permits or tax stamps as whiskey dealers.

The defendants' newspaper advertisements, brochures and salesmen classified the Scotch whiskey which was being offered for sale to the public as an investment which can be expected to yield twenty to twenty-five per cent per annum.

The sale was evidenced by a paper writing—The plaintiff labels it a ware-

house receipt—The defendants say it is a "letter of acknowledgment."

Under British law Scotch whiskey is distilled in Scotland from either grain or malt and aged in casks in Scotland in a bonded warehouse for a period of not less than three years—It may be imported for consumption in the United States as Scotch whiskey providing it is aged for not less than four years. Consumer taste requires most Scotch whiskey to be aged for eight to twelve years—some as much as twenty-five to thirty-five years. The age of blended Scotch is the cask age of the youngest whiskey which is part of the blend.

British law further requires the warehouseman to maintain a complete record of the casks in his bonded warehouse— He records the title and issues the owner a warehouse receipt. Title may be transferred by executing a delivery order—A transferee may record his title by endorsing the delivery order and sending it to the warehouse. When a transfer of ownership is made on the warehouseman's books, he issues a whiskey warehouse receipt acknowledging the transfer of title in the name of the transferee.

Haffenden Brokers are whiskey brokers in England. They have been the main source of warehouse receipts sold by the defendants since 1969.

Prospective purchasers were obtained by the defendants through newspaper ads and from other purchasers. Typical newspaper ads read—

Disgusted With the Stock Market?
Invest in Scotch Whiskey
For Information on Capital Growth
Potential Through Fully Insured
Scotch Whiskey Investments
Contact
Rimar Corporation

- - - - -

Purchase and Hold Scotch Whiskey
For Profit
Maturing in Government Bonded Warehouses in Scotland

All Risks Insurance Through Lloyd's of London

Capital Gains Have Averaged 20% Per Annum For the Past 20 Years

Salesmen were directed to stress "The older the Scotch whiskey becomes, the more valuable it becomes—and that people down through the years were making a profit off of Scotch whiskey—The value of warehouse receipts have doubled in a period of, say, four years."

The salesmen further stressed the advantages of an investment with an annual return of twenty to twenty-five per cent on an investment insured by Lloyd's of London—The nature of the investment was explained in terms of financing the Scotch whiskey industry during the aging period—When aged, Haffenden or other industry members would repurchase the whiskey for blending.

If the subject arose, investors were told that it was impracticable to import their holdings into the United States because of licensing requirements—The salesmen stated that Rimar would select a whiskey and make all the arrangements for insurance against all risks of physical loss and excess ullage, and would provide market information and would later repurchase the whiskey or arrange for its resale.

The whiskey purchased for the investor had a mark-up of thirty-six to seventy per cent. The salesmen were paid a commission on the sale—This information was not furnished the investor.

When a buyer executes his purchase order he is not told what type of Scotch will be selected for him or the type of cask in which it will be aged except that the whiskeys will be selected out of Haffenden's balanced inventory and at the time of resale Haffenden would be one of the principal users [purchasers] of the investor's underlying Scotch whiskey.

The defendants select the casking and the warehouse—Wood varies greatly in quality and warehouses vary greatly in services performed.

When a sale is made the investor executes a purchase order and makes out a check for ten per cent of the purchase order—The salesman usually fills in the details, that is, the number of casks of grain or malt whiskey of a given age. The executed purchase order and the deposit are then mailed to the head office of the Rimar Company and the money is deposited in the company's bank account —H-R, Trading Company or Rimar then places a covering order for warehouse receipts with Haffenden Brokers in London.

Haffenden then selects the whiskey which lies in casks in a bonded warehouse and arranges for insurance for the investor, if requested—They then execute the delivery orders drawn to the order of the customer and prepare an invoice reflecting the gross price to the investor in pounds sterling, a details delivery order and a statement of the mark-up or commission to be retained by H-R, Trading Company or Rimar—and Haffenden then mails the delivery orders, the insurance certificate, invoices and mark-up or commission statement to H-R, Trading Company or Rimar.

H-R, Trading Company or Rimar retains the commission statement for its files and prepares an invoice on its letterhead for the investor showing the gross price in dollars to the customer of the warehouse receipts and insurance— The company also prepares letters of instruction to the warehouseman for the signature of the investor to accompany the delivery order. These papers are then mailed to the salesman for delivery to the investor upon payment of the balance due.

Upon payment the delivery order and letter of instruction are then mailed to the warehouse involved. The warehouse then issues and mails a warehouse receipt to the investor.

H-R, Trading Company and Rimar neither obtain, assist nor advise the investor in re obtaining federal or basic permits or federal or state tax stamps.

 From the record here made, the Court is satisfied that the offer and sale of Scotch whiskey under the circumstances and conditions above mentioned constitute the offer and sale of a security in the form of an investment contract. Whether the evidence of sale be labeled a warehouse receipt or letter of acknowledgment is immaterial. The Securities Act clearly reaches any novel, uncommon or irregular device, whatever it appears to be, if it be proved as a matter of fact that it was widely offered or dealt in under terms or courses of dealing which established its character in commerce as an investment contract or as any interest or instrument commonly known as a security. The Supreme Court of the United States so stated in S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

In fixing the guidelines for determining whether an offering is a security under the Act[1], the Supreme Court in Joiner, supra, and in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), said:

" . . . The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promotors' offerings be judged as

---

1. Section 2(1) of the Act, 15 U.S.C. § 77b(1), provides:
 "The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

being what they were represented to be." S.E.C. v. C. M. Joiner Leasing Corp., supra.

" . . . In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoters. . . ." S.E.C. v. W. J. Howey Co., supra.

Clearly the sales here made fall within these guidelines.

The defendants' contention that the investors purchased a specified number of gallons of raw unblended whiskey to hold, consume, sell or deal with as they see fit is not borne out by the evidence in this case—to the contrary, the promotors talked about investments—doubling or tripling the original dollar investment, to be used when and as the investor needed it most—twelve to fifteen years in the future.

None of the original investors were told how or under what conditions they could import or use or sell the Scotch they had purchased in this country—If they asked about it they were discouraged from so doing because of the licensing requirements. They were, however, belatedly told that they could so do after this suit was filed, but even then they were not fully advised in the premises.

Most, if not all, of the investors relied solely on the advice of the defendants in selecting, buying, storing, trading and selling the Scotch represented by their warehouse receipts and/or letters of acknowledgment—Their participation in the enterprise was limited to providing capital with the hope of a favorable return.

Even if this be found to be the sale of an interest in Scotch whiskey—when such interests become the subjects of speculation in connection with the whiskey enterprise, courts have held convey-

ances of the whiskey to be securities. (Paraphrased from Matter of Waldstein, 160 Misc. 763, 291 N.Y.S. 697, involving the sale of cemetery lots—fn. 10, p. 352 of 320 U.S., 64 S.Ct. 120, Joiner Corp., supra.)

The Court further finds that the defendants willfully and knowingly violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, by making false and misleading statements of material fact to purchasers and prospective purchasers of the aforesaid Scotch whiskey, warehouse receipts and/or letters of acknowledgment; namely, that if held for approximately four years the investment will provide an annual profit of twenty to twenty-five per cent and that the investment was safe, when they knew that it was highly speculative; and by advising the investors that their purchase was fully insured against all risks of physical loss and excess ullage, when they knew that the said insurance did not cover all such losses.

Further, the defendants did not fully advise the investors of the risks involved in market fluctuations for Scotch whiskey or the source or basis for the market price quotations used in making the projections of investment profits, and by failing to advise the investors of the amount of the sales and insurance commissions retained on each resale, and by failing to advise the purchasers that the receipt or sale of bulk whiskey in the form of Scotch whiskey warehouse receipts might subject them or the holder or vendor to certain permit and tax provisions of the United States Code.

The Court is satisfied from the record here made that there is sufficient basis for the entry of an order permanently enjoining the defendants from further violations of the mentioned sections of the Securities Act of 1933 and the Securities Exchange Act of 1934.