**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**GLEN–ARDEN COMMODITIES, INC.**
**formerly known as Milbank Trading**
**Co. of Conn., Inc., et al., Defendants.**

**No. 73 C 1264.**

United States District Court,
E. D. New York.

Jan. 17, 1974.

William D. Moran, Regional Administrator, Securities and Exchange Commn, New York City by William Nortman, Franklin D. Ormsten, Steven J. Shore and John J. O'Connor, New York City, of counsel, for plaintiff.

Brewer & Soeiro by Bradley R. Brewer, New York City, of counsel; Benjamin J. Golub, New York City, for defendants.

COSTANTINO, District Judge.

In this action the plaintiff seeks injunctive relief, both temporary and permanent, against the eight defendants named in its complaint, based upon certain alleged violations by them of the Securities Act of 1933, 15 U.S.C. §§ 77a et seq. and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. In its first cause of action the Securities and Exchange Commission (S.E.C.) alleges that the defendants have violated and are violating Sections 5(a) and (c) of the Securities Act of 1933, in that they offered and sold unregistered securities in the form of Scotch whisky warehouse receipts. The second cause of action alleges that defendants have been and are employing devices, schemes and artifices in connection with the sales of the warehouse receipts to defraud, in violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The S.E.C. charges in its third cause of action that the corporate defendants Glen-Arden Commodities, Inc. (Glen-Arden) and Milbank Trading Co. Inc. (Milbank) have been and are unlawfully acting as broker-dealers in securities, in violation of Sections 15(a) and (b) of the Securities Exchange Act of 1934.

■ The court has subject matter jurisdiction pursuant to Section 22(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77v(a) and Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa; or in the alternative pursuant to Section 1345 of Title 28 of the United States Code.[1]

The essential issue in this litigation is whether the warehouse receipts offered by the defendants are securities as defined by Section 2(1) of the Securities Act of 1933. The Supreme Court in S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), stated that the test for determining whether an offering is a security under the securities law is:

> what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the

1. On October 4, 1973 Bradley R. Brewer, Esq., counsel for the defendants, filed with the court a self-styled motion to dismiss pursuant to Federal Rules of Civil Procedure 12 and 56, accompanied by his affidavit. The motion purported to place in controversy subject matter and in personam jurisdiction. However, Mr. Brewer's affidavit, based solely upon his "limited" knowledge merely evinced, (1) that he was unsure of whether all the defendants had been personally served and, (2) that he denied several key allegations of the complaint. Consequently, the court's jurisdiction has never been seriously controverted. Rather, defendants' motion went to the merits of the action and was accordingly treated as a motion for summary judgment.

economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promotors' offerings be judged as being what they were represented to be. *Id.* at 352–353, 64 S.Ct. at 124.

The Court gave additional guidelines in S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), when it stated:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme, whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promotor or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. Id. at 298–299, 66 S.Ct. at 1103.

Later in its opinion the Supreme Court stated further that:

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value. . . . The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae. Id. at 301, 66 S.Ct. at 1104.

It is clear then that the manner in which the Scotch whisky warehouse receipts were sold—the information given, profits predicted, services promised and the obligations to be assumed by the purchasers—were at all times relevant to the proceedings before the court.[2]

The action was commenced on August 23, 1973. With the consent of all parties defendants' time to answer was extended until September 28, 1973. On September 12 the S.E.C. filed a motion for an order granting a preliminary injunction, enjoining the defendants from further violations of the Securities Acts. Fed.R.Civ.P. 65. On September 19, counsel for the defendants filed an Order to Show Cause which sought, *inter alia,* to further extend defendants' time to answer to October 24, to postpone the return date of the S.E.C.'s motion for a preliminary injunction and to hold the return date in abeyance pending a hearing on defendants' motion to dismiss. The court extended defendants' time to answer and postponed the return date of the hearing to October 4, 1973. Further extensions and delays were tolerated by the court because of the complexity of the issues and the problems encountered by defense counsel in preparing for the hearing. Finally, November 15 was set down as the date for the hearing on the preliminary injunction. However, on the eve of the hearing, defense counsel moved to empanel a three-judge court to determine the "jurisdictional" question and for an order enjoining the court from conducting the hearing. After the court denied his motion, defense counsel sought a writ of mandamus from the United States Court of Appeals for the Second Circuit. This was denied, and following further delays occasioned by the illness of defense counsel, the hearing on the preliminary injunction commenced on November 16, 1973.

At the conclusion of the proceedings on that day, the court, confronted by

---

**2.** Defendants' attorney has artfully attempted to impose a bifurcated procedure in this case whereby the court would hold a separate hearing on the question of jurisdiction and then another on the question of fraud. The court rejected this course when it became clear that its jurisdiction was not in issue and that the evidence concerning the question of whether the defendants were selling securities within the meaning of the Securities Act would have been of necessity substantially the same as that which would have been presented on the issue of fraud. No intelligent division of the evidence was discernible and furthermore, no legitimate reason was offered to justify what would have had to have been a wasteful and costly protraction of the proposed hearing.

significant evidence tending to show that the defendants were in violation of the securities laws, that they were engaged in fraudulent activities and that there was a need to prevent further exploitation of the investing public, granted a temporary restraining order for one week until the hearing could be continued. At that juncture the court had before it the testimony of Randall Hanes, a customer of Milbank, in addition to the following documents:

1. The verified complaint of William D. Moran, Regional Administrator of the Securities and Exchange Commission;

2. The affidavits of John J. O'Connor, attorney for the S.E.C. including appendices;

3. The affidavit of Franklin D. Ormsten, attorney for the S.E.C., including appendices.

Further testimony and documentary proof reinforced the court's original view that defendants might be violating the securities laws, that they might have been engaged in fraudulent activity and that there was imminent danger of exploitation of the public. Accordingly, the court granted extensions of the temporary restraining order until the hearing could be concluded and a determination of the S.E.C.'s motion for a preliminary injunction could be made.

The evidence adduced at the hearing, which included the testimony of customers, salesmen and employees of defendants, as well as defendants' own sales literature, establishes that the defendants were engaged in the offer and sale of Scotch whisky warehouse receipts, which evidence ownership of casks of whisky stored in bonded warehouses in Scotland. Essentially, their mode of operation was to recruit salesmen familiar with neither the Scotch whisky business nor investment practices, provide these men with a "canned" sales pitch along with sales literature and direct them to potential customers solicited through mass merchandising techniques such as newspaper advertisements and the indiscriminate use of mailing lists.

The training of the salesman consisted of meetings at which defendants or their employees provided data on the price of Scotch whisky, the cost of insurance and cooperage and the profits which could be anticipated from an investment in Scotch whisky warehouse receipts. Specifically, there is evidence that defendants Albert J. Deeb, Charles Loffman, David Loeb and David Losey appeared at various sales meetings during which the salesmen were instructed to make the following assertions to induce prospective customers to invest in Scotch whisky warehouse receipts:

(1) Milbank would utilize its expertise in selecting the type and quality of Scotch whisky and casks to be purchased;

(2) Customers could call Milbank and obtain current information about the Scotch whisky market;

(3) Milbank would provide the cooperage of the whisky;

(4) Milbank would provide two insurance policies to protect the investments;

(5) When the customers wished to sell their whisky, Milbank would assist them in making a sale at the current pricing schedule, charging no fee or commission;

(6) Milbank would handle all administrative details of the transaction; and

(7) Customers could expect a doubling of the value of their investment within three to four years and further increments after that.

The testimony of several customers establishes that these promises were in fact made to them. There is also evidence that the prices provided to the salesmen and therefore quoted to potential customers were inflated and well in excess of the average market prices for Scotch whisky. In addition, salesmen were encouraged to make "quick" presentations using the "support" data supplied by the defendants. It is notewor-

thy that the salesmen were specifically instructed not to leave this data with the customers. The testimony of the customers confirms that after the sales presentation no data were left with them. The customers were given Milbank sales literature and the documents of title only. Each investor was furnished with an original sales order which set out the quantity of whisky and its price, a confirmation of the sales order which included the registration numbers for each barrel, a copy of a warehouse keepers record reflecting transfer of title to the customer, a transfer warrant issued by the distillery confirming transfer and registration of ownership to the purchasing investor, two insurance policies issued by Lloyds of London, and a form ordering the warehouse keeper to transfer ownership which includes a warranty of the new owner's signature. The sales literature extolled the virtues of an "investment" in Scotch whisky in bond and promised exceptional capital growth because of the unique quality of Scotch in that its value enhances merely with age.[3]

The testimony of the investors established that they were not knowledgeable about the Scotch whisky market and relied solely on the expertise of defendants in the management of their investments. Furthermore, their testimony indicates that they were not fully apprised of the risks involved in investments in Scotch whisky, *i. e.,* fluctuations in price or difficulties in resale. Of critical importance is the testimony of all the investors that if they had not been furnished cooperage and insurance and had not been promised assistance in the liquidation of their investments they would not have purchased the warehouse receipts.

Faced with the evidence in this case the defendants' contention that they were merely selling gallons of raw unblended whisky that could be consumed, sold or dealt with as a purchaser saw fit is untenable. The sale of the warehouse receipts must be viewed in their totality; substance and not form is controlling. Unquestionably, the warehouse receipts were merely a means by which the defendants transacted their business. Their true product was an investment package. Ownership, right of possession or the right to consume were in reality of little import to the purchasers of the receipts. Defendants' solicitation, its advertisements, its sales literature and, most importantly, the statements of its salesmen, emphasized that the purchasers were making an investment. Prior to the consummation of a sale no attempt was made to apprise an investor of the risks and obligations he was assuming. It was only when an investor attempted to liquidate his investment that he was advised of the true significance of his holdings. The court finds that the "investment package" offered and sold by defendants is a security within the ambit of section 2(1) of the Securities Act of 1933. S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); S. E. C. v. M. A. Lundy Associates, 362 F.Supp. 226 (D.R.I.1973); S. E. C. v. Haffenden-Rimar International, Inc., 362 F.Supp. 323 (E.D.Va. 1973). Concomitantly the court finds that the defendants were offering and selling unregistered shares in violation of section 5 of the Securities Act of 1933 and that they were engaged in a scheme to defraud investors by making untrue and misleading statements in violation of section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

Accordingly the court is satisfied from the record that there is a sufficient basis for entry of an order of preliminary injunction enjoining the defendants from further violations of the securities laws. Gulf & Western Indus-

---

3. There is strong evidence that the value of whisky is determined by laws of supply and demand and that age alone does not determine its price.

tries, Inc. v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687, 692–693 (2d Cir. 1973); Stark v. New York Stock Exchange, Inc., 466 F.2d 743 (2d Cir. 1972); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir. 1969). The S.E.C. has clearly met its burden of showing probable success on the merits and that there is a likelihood of continued violations of the registration and anti-fraud provisions of the securities laws.

In rendering its decision the court is ever mindful of the public interests involved. The evidence substantially establishes that the defendants have been engaged in a pervasive scheme to defraud the public.

The foregoing opinion shall constitute the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

The S.E.C. is directed to prepare and present for entry an order in conformity with the findings of this opinion.