Glen LINGENFELTER, Eileen J. Lingenfelter, Alvin F. Pfeifer, Margaret Pfeifer, Carl W. Conrad, Valasta Conrad, Florence Pfeifer, Roy C. Duffey, Judy R. Duffey and Leo Pfeifer, Plaintiffs,

v.

TITLE INSURANCE COMPANY OF MINNESOTA, a Minnesota Corporation, Sunshine Land & Cattle Corp., an Arizona Corporation, Minnesota Title Company, an Arizona Corporation, Defendants.

Civ. No. 74–0–129.

United States District Court, D. Nebraska.

Oct. 13, 1977.

Maureen E. McGrath, Omaha, Neb., for plaintiffs.

Robert J. Banta, John W. Delehant, Omaha, Neb., for defendants.

## MEMORANDUM

DENNEY, District Judge.

Plaintiffs brought this action against Sunshine Land and Cattle Corporation (Sunshine), Title Insurance Company of Minnesota (Ticom) and Minnesota Title Company (Minnesota Title), alleging that the defendants acted in concert to violate the Securities Acts of 1933 and 1934 in their sale of investments to the plaintiffs. The complaint alleges violations of sections 12(1), 12(2) and 17 of the 1933 Act, 15 U.S.C. § 77*l*(1), § 77*l*(2) and § 77q; section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240.10b–5, and also charges common law fraud. In addition, plaintiffs contend that if Ticom and Minnesota Title are not liable as principals, they aided and abetted Sunshine's violation of the 1933 and 1934 Acts.

## FINDINGS OF FACT

Sunshine, an Arizona corporation, acquired, developed, subdivided and sold real estate in Arizona through a financing arrangement known as the subdivision trust. Sunshine's primary development project was Phoenix Valley West.

In addition to the sale of land to lot purchasers, Sunshine began in 1971 to sell to the investing public assigned promissory notes and mortgages executed by its lot purchasers and Sunshine's own promissory notes secured by first mortgages or assigned beneficial interests in the subdivision trusts. The plaintiffs, Nebraska residents, purchased packages consisting of the above evidences of indebtedness accompanied by insurance and collection services described more fully below. None of the plaintiffs purchased land.

In Nebraska, Sunshine marketed the investment packages through Art Bradley, then an unlicensed broker, previously a vacuum cleaner salesman, now a travel agent. Bradley was co-owner of A. B. Enterprises, apparently formed for the purpose of selling Sunshine's land and debt investments. Bradley solicited investors using mass merchandising techniques. John Mihlik, President of Sunshine, participated in the sales pitch presented to prospective investors at large dinner meetings and supplied or approved all of Art Bradley's promotional material.

.The packages of notes, mortgages, assigned trust interests and accompanying insurance and collection services sold to plaintiffs were not registered as securities with the Securities and Exchange Commission (S.E.C.). The Court finds that the sales of these packages were accomplished by material misrepresentations, nondisclosures of material facts and misleading statements attributable to Sunshine through the acts of its agent, Art Bradley, and its President, John Mihlik. Sunshine has confessed judgment as to each plaintiff, and this case was tried on the issue of the other defendants' liability.

## I.

Ticom is a real estate title insurance company, incorporated in Minnesota and licensed to transact the business of title insurance in Nebraska, Arizona and other states. Minnesota Title, Ticom's wholly owned subsidiary incorporated in Arizona, acts, among other functions, as trustee and administrator of Arizona subdivision trusts. When so authorized, Minnesota Title also serves as collection agent for installment payments from persons who purchase real estate held in such trusts and disburses payments to trust beneficiaries or their assignees under the terms of the collection agency agreements. Sunshine, in connection with the sale of investments to persons including the plaintiffs, obtained the services of Ticom and Minnesota Title. In order to evaluate the role of these defendants in Sunshine's activities, it is necessary to describe a subdivision trust.

## II.

Abstracts of title are not used in Arizona, and title insurance policies are issued for virtually all real estate conveyances. Arizona title insurance companies perform escrow functions, and real estate closings usually take place in the escrow department of the insurance company. The company arranges for recording of documents and provides other services. Both escrow and subdivision trust management are functions commonly performed by title insurance companies doing business in Arizona.

In the typical subdivision trust arrangement, an owner of land, e. g., a rancher, sells a large tract to a developer who plans to subdivide it into lots. In the case of a "dual beneficiary trust," the developer pays only a down payment at the time of closing. The rancher/seller conveys legal title to a "trustee," usually the title insurance company. The rancher is the "first beneficiary" of the trust, and the developer is the "second beneficiary." The trustee acts under the terms of the trust agreement executed by the rancher and the developer and performs certain ministerial functions such as collecting payments from the second beneficiary for the account of the first beneficiary. The transaction is similar to an unrecorded land sale contract.

Such trust agreements often give the developer important privileges. Upon payment of a "release price," he may cause a parcel or lot to be deeded out of the trust and released from the rancher's first beneficial interest. Then the developer may sell the parcel. If he does so, the title insurance company issues a policy of title insurance to the lot buyer. If the lot buyer executes an installment payment contract, the trustee may collect the payments, as the developer often intends to pay his seller from the deferred payments received from such lot purchasers.

Instead of selling the released parcel, the developer may use it as collateral for a loan. In this situation, the trustee deeds the title to a parcel to the developer who executes a first mortgage in favor of his lender. The developer either retains legal title to the parcel subject to the mortgage, or transfers title back to the trustee subject to the lender's lien. In either case, the title insurance company issues a policy of mortgagee's title insurance to the lender.

As title insurance is the universal practice upon real estate closings in Arizona, the subdivision trust facilitates the title insurer's job. As holder of legal title, it oversees and participates in any transfer of legal interest in the subdivision. The insurer has a complete record of the subdivision and

need not conduct an extensive title examination with each transfer of a parcel by the developer.

In the alternative, the developer may leave the land in trust and borrow against it by assigning or pledging his second beneficial interest in specific parcels of the land. This device is a "collateral assignment of beneficial interest." No title insurance is issued because the trustee has not relinquished legal title. Each collateral assignment of beneficial interest requires an acknowledgement by the trustee.

### III.

Pursuant to trust agreements with Sunshine, Minnesota Title served as trustee of certain subdivision trusts. Plaintiffs provided funds to Sunshine and received interest-bearing investments of three types. The first type of investment package included an assigned lot buyer's mortgage, installment contract and note, discounted to yield 11% interest, Sunshine's endorsement of the lot buyer's note with recourse, guaranteeing replacement if the lot buyer defaulted, and an installment collection agreement providing for collection of lot buyer payments for the account of the investor by Minnesota Title. The second type included Sunshine's promissory note with interest at 12%, a first mortgage executed by Sunshine in favor of the investor and a policy of mortgagee title insurance issued by Ticom in the investor's name. Minnesota Title recorded the mortgage. The third package consisted of Sunshine's promissory note with interest at 12–14%, a collateral assignment of Sunshine's beneficial interest with respect to a portion of the land held in a dual beneficiary trust and an acknowledgement of the collateral assignment by Minnesota Title as trustee of the subdivision trust.

### CONCLUSIONS OF LAW

*Securities*

■ The Court finds that each of the above investment packages is a "security" in the form of an investment contract, as defined in section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1). *See* the three-part test for an investment contract established in *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). For the same or similar types of transactions all of which have been held to constitute the sale of investment contracts, *see Los Angeles Trust Deed & Mortgage Exchange v. S.E.C.*, 285 F.2d 162 (9th Cir. 1961); *Hall v. Sec. Planning Serv., Inc.*, 371 F.Supp. 7 (D.Ariz.1974); *S.E.C. v. Thunderbird Valley, Inc.*, 356 F.Supp. 184 (D.S.D. 1973); *S.E.C. v. Dell Investment Co.*, No. CV 72–L–121 (D.Neb.1972), reprinted in *Hall v. Sec. Planning Serv., Inc., supra*, 371 F.Supp. at 17–19; *S.E.C. v. Lake Havasu Estates*, 340 F.Supp. 1318 (D.Minn.1972); *S.E.C. v. Great Western Land & Development, Inc.*, CCH Fed.Sec.L.Rep. ¶ 91,537 at 95,001 (D.Ariz.1964). *See also, S.E.C. v. Heritage Trust Co.*, 402 F.Supp. 744, 746 (D.Ariz.1975).

■ Moreover, the definition of a security is the same under the 1933 Act as under the 1934 Act. *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914 n. 3 (8th Cir. 1976).

The Court finds, in addition, that these securities were offered, sold and delivered by use of the mails and facilities of interstate commerce.

*§ 17, 1933 Act*

■ Plaintiffs' second cause of action is founded in part on section 17 of the Securities Act of 1933, 15 U.S.C. § 77q. The Eighth Circuit has ruled that section 17 does not confer a private cause of action in favor of the purchaser of securities sold in violation of that section. *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 155 (8th Cir. 1977). The private remedy is provided by section 12(2), 15 U.S.C. § 77*l*(2), and the elements of a claim under that section must be established.

*§ 12(1), 1933 Act*

Section 12(1) of the 1933 Act, 15 U.S.C. § 77*l*(1), imposes almost per se liability upon one who offers or sells an unregister-

ed security by means of the mails or facilities of interstate commerce if such security was required to be registered by section 5 of the Act, 15 U.S.C. § 77e. *Mason v. Marshall*, 412 F.Supp. 294, 300 (N.D.Tex. 1974), aff'd, 531 F.2d 1274 (5th Cir. 1976).

■ The sales of securities to plaintiffs were consummated between May, 1971 and June, 1972, and the original complaint in this action was filed on May 10, 1974. A claim based on section 12(1) must be brought within one year after the violation. 15 U.S.C. § 77m; *Gridley v. Cunningham*, 550 F.2d 551, 552 (8th Cir. 1977). The Court finds that the statute of limitations established in section 13 of the 1933 Act bars any claim in this action founded on section 12(1).

■ Plaintiffs assert that defendants should be estopped from relying on the statute of limitations because Art Bradley, in connection with the sale of the securities, misrepresented that the requirements of the 1933 Act had been fully satisfied. Moreover, plaintiffs contend that this case is characterized by continuing nondisclosures of material information, so that they were lulled into a false sense of security.

Whether the statements of Art Bradley and the continuing nondisclosures by Sunshine should be attributed to Ticom and Minnesota Title and whether these defendants breached a duty to disclose information to the plaintiffs will be discussed below. Even if the Court decided in favor of the plaintiffs on these points, estoppel would not be appropriate in this action.

A federal estoppel doctrine has been held applicable to the federal securities laws. *In re Alodex Corp. Sec. Litigation*, 392 F.Supp. 672, 684 (S.D.Iowa 1975), aff'd, 533 F.2d 372 (8th Cir. 1976), *citing Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2nd Cir. 1969). However, a person to be estopped from relying upon a statute of limitations must have urged the plaintiff to delay legal action, *In re Alodex Corp. Sec. Litigation, supra*, 392 F.Supp. at 685; or made some statement upon which plaintiff relied in postponing commencement of suit, *Livens*

*v. Witter*, 374 F.Supp. 1104, 1108 (D.Mass. 1974); or conducted himself in such a way that plaintiff "was justifiably misled" into "a good faith belief" that he could begin his action within a longer period than the law actually provides, *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). In the *Glus* case, the defendant, knowing of the three year limitations period, induced plaintiff's delay by falsely representing that suit could be brought within a seven year period. There is no evidence of any such misrepresentation by Ticom or Minnesota Title. There is also no evidence of the kind of on-going assurances made in *Katz v. Amos Treat & Co., supra*. The Court finds no basis for applying the doctrine of estoppel.

■ In May, 1973, a replacement lot buyer note and mortgage and a title insurance policy were issued to plaintiffs Roy and Judy Duffey, within the one year limitations period before suit was filed. Sunshine assigned the substitute note in exchange for a previously assigned lot buyer note and mortgage which had been prepaid. The Court finds that such exchange was exempt from registration under section 3(a)(9) of the 1933 Act, which exempts

> [a]ny security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange.

■ Sunshine's assignment of lot buyer purchase money notes, contracts and mortgages expressly provided for substitution of other such notes, contracts and mortgages in the event of the original lot buyer's default. Moreover, Sunshine consistently made such replacements when lot buyers prepaid their contracts. This practice was not unreasonable as plaintiffs clearly made their investments to obtain the high interest rates and were not interested in an early return of their capital. While the fact that Sunshine kept the advance payoff funds from such prepayment may have constituted fraud by Sunshine, no commission, remuneration or consideration was provided by Sunshine or by plaintiffs in connection

with soliciting such replacements. Accordingly, the documents issued to Roy and Judy Duffey on May 27, 1973 satisfy the language of the exemption, and no action based on section 12(1) may be maintained as to that exchange.

*§ 12(2), 1933 Act*

■ Section 12(2) of the 1933 Act, 15 U.S.C. § 77l(2), provides that

' [a]ny person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him.

Section 12(2) applies to unregistered securities as well as to those for which a registration statement has been filed, so long as a misleading prospectus or oral communication was used to offer or sell them. *Kroungold v. Triester,* 407 F.Supp. 414, 418 (E.D. Pa.1975). To impose liability on Ticom and Minnesota Title, plaintiffs must establish (1) that those defendants offered or sold a security (2) by the use of any facility of interstate commerce (3) through an oral communication (4) which included an untrue statement of material fact or an omission of material fact "necessary in order to make the statements, in the light of the circumstances under which they were made not misleading" and (5) that plaintiffs did not know of the untruth or omission. Defendants bear the burden of proving that they did not know and in the exercise of reasonable care could not have known of such untruth or omission. *See Alton Box*

*Board Co. v. Goldman, Sachs and Co.,* 560 F.2d 916, at 918 (8th Cir. 1977); *Gridley v. Sayre & Fisher Co.,* 409 F.Supp. 1266 (D.S. D.1976).

■ Neither Ticom nor Minnesota Title nor any employee or officer of these companies made any oral communication to any plaintiff. Neither company had any contact with the plaintiffs until after the sales were completed. As will be discussed in connection with the section 10(b) and Rule 10b–5 claim, the representations by Art Bradley and John Mihlik should not be imputed to the insurance companies. Most important, the Court finds that neither defendant "offered" or "sold" a security to the plaintiffs.

■ Plaintiffs do not seriously contend that the title insurance policies issued by Ticom or the collection or trustee services performed by Minnesota Title, standing alone, constitute securities. In any event, the Court finds that they are not. Therefore, whether either of these defendants was an "offeror" or "seller" of the investments purchased by plaintiffs depends on its role, if any, in marketing the investment contracts.

The term "sale" or "sell" shall include every contract of sale or disposition of a security or interest in a security, for value. The term "offer to sell," "offer for sale," or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value. 15 U.S.C. § 77b(3).

■ The Court does not accept plaintiffs' contention that the inclusion of title policies and trustee or collection services in each investment package automatically made Ticom and Minnesota Title "sellers" of the entire package. In two cases involving the sale of whiskey warehouse receipts and attendant services, the investment contracts included insurance policies issued by Lloyds of London. *See S.E.C. v. Glen-Arden Commodities, Inc.,* 368 F.Supp. 1386 (E.D.N.Y.1974), *aff'd,* 493 F.2d 1027 (2nd Cir. 1974); *S.E.C. v. Haffenden-Rimar Int'l,*

*Inc.,* 362 F.Supp. 323 (E.D.Va.1973). In the latter case, the investments were touted as "fully insured . . . . all risks insurance through Lloyd's of London." *Id.* at 325. As in this case, the seller of the receipts obtained the insurance. While arranging for services of this nature may be one indication of an investment contract, their use does not prove that those providing such services are sellers of the entire package. Lloyds was not a defendant in either action, and its liability was not at issue. However, the cases exemplify the use by the actual seller of bona fide institutional services to lend a reassuring aura of validity to the entire package.

 Plaintiffs allege that the defendants' role was indispensable to the operation of Sunshine's scheme to sell the investments. As to Minnesota Title's trustee services, this contention has an element of truth, in the sense that a bank is indispensable to one who forges checks or overdraws an account. However, Sunshine's use of Minnesota Title's services for its own fraudulent purposes does not make Minnesota Title a participant in the fraud or the sale.

 As to Ticom, the evidence does not show that title insurance was indispensable to the sale of the investment contracts. Title insurance apparently did not serve as a major inducement for the plaintiffs' purchases. Leo Pfeifer, for example, had no idea what title insurance is. Plaintiffs purchased Sunshine's notes and first mortgages because of the high interest rates. No plaintiff suggested that he or she would have declined to purchase had title insurance been omitted from the package. *Cf., S.E.C. v. Glen Arden Commodities, Inc., supra.*

Plaintiffs attach great significance to the privity of contract between plaintiffs and defendants with regard to the title insurance policies and installment collection agreements. *See contra First Trust & Savings Bank of Zanesville, Ohio v. Fidelity-Philadelphia Trust Co.,* 112 F.Supp. 761 (E.D.Pa.1953).

Plaintiffs contend that they were "required" to execute installment collection agreements with Minnesota Title in connection with the purchase of assigned lot buyer notes. However, the "assignment of contract" accompanying the assigned notes clearly stated that "[t]he assignee(s) may elect to collect the Agreement for Sale by the Assignee(s), by any other person, agency or corporation, if the assignee(s) desire." Kenneth Mattison, trust officer for Minnesota Title during this period, testified that his company did not require Sunshine or its assignees to appoint Minnesota Title as the collection agent, but that if Minnesota Title was asked to perform this service, it needed a written agreement and would charge a service fee of $1.00 per month for each such contract. The company's subdivision trust agreement was with Sunshine, and if it was to disburse funds to third parties on behalf of Sunshine, the company required written authorization. Sunshine paid the $1.00 fee and all insurance premiums.

The Eighth Circuit has specifically rejected the broad "participation" test used by the Southern District of New York to define "seller" under section 2(3) of the 1933 Act, 15 U.S.C. § 77b(3).

> The participation concept would hold liable virtually every person who participated in the events leading up to the transaction. . . . The participation theory is too broad in that it extends liability to persons for remote or incidental connection with the transaction. . . . The "sale" term in § 2(3) was meant to be interpreted liberally . . . but not so liberally that all participants in a transaction share liability. *Wasson v. S.E.C.,* 558 F.2d 879, 885–86 (8th Cir. 1977). (Citations omitted).

 The Eighth Circuit also declined to adopt the Fifth Circuit's "proximate cause" test, apparently because this approach leads to the overly mechanical operation of a principle derived from tort law without sufficient emphasis on the policies underlying the 1933 Act. *Id.* at 886. In *Wasson,* a broker who did not actually execute the sale was held a "seller" because of his "ex-

tensive involvement" with the transaction at its initial stage. The broker was treated as a seller

> because of his extensive role in facilitating the sale because he was made aware of questionable circumstances surrounding the transaction . . . and because his position in the flow of information made his failure to fully investigate or disclose all the more serious. *Id.* at 887.

Ticom and Minnesota Title played no role in facilitating sales of plaintiffs' securities, and plaintiffs have failed to prove that the companies were aware of questionable circumstances surrounding the sales which they should have investigated or disclosed.

In *Hall v. Sec. Planning Serv., Inc.*, No. Civ. 72–393–Phx–WPC (D.Ariz.1975) (unreported), the Court granted summary judgment dismissing claims based on section 12(2) of the 1933 Act and fraud against Standard Land Title & Trust Agency, trustee and collection agent serving the same functions as Minnesota Title. The Court concluded that

> Standard Land Title & Trust Agency had no connection with any plaintiff until after the sale of mortgages to the plaintiffs; that Standard Land Title & Trust Agency did not participate in the actual sale of securities of Cochise College Park; that the practice of forwarding to mortgage assignees funds provided by the developer without notice does not constitute aiding and abetting in the sale of securities; and that the collection practices of Standard Land Title & Trust Agency were proper and did not constitute aiding and abetting in the sale of securities under the State or Federal Securities Laws.

. . .

These conclusions are equally applicable to Minnesota Title in this case.

The Court finds, in addition, that Ticom and Minnesota Title did not aid and abet Sunshine's violation of section 12(2) of the 1933 Act.

### § 10(b), 1934 Act

■ The applicable portion of section 10(b) of the 1934 Act, 15 U.S.C. § 78j states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, . . .

> \* \* \* \* \* \*

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules or regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

While the section prohibits fraud in connection with the sale of securities, a defendant need not be a "seller" to be liable.

S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5 states that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, . . .

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

■ Defendants do not deny that Art Bradley made many untrue statements of material fact in connection with the sale of plaintiffs' investments.[1] However, the

---

1. The promotional pamphlet Bradley showed to each plaintiff alleged as "Facts" that "[w]e comply strictly with the 1933 Securities Act" and "with all State and Federal Laws" and that "[a]ll mortgages are secured by real estate which is located in a population growth area

Court finds that his misrepresentations should not be imputed to Ticom and Minnesota Title and that Bradley was not the agent of these defendants.

Bradley testified that he never had any contact with Ticom or Minnesota Title, that he regarded himself as the agent of Sunshine and that he never stated to the plaintiffs that he was acting as the agent of the insurance companies. Bradley never submitted any promotional material for approval by either company. No documents ever passed between Ticom or Minnesota Title and Bradley. Sunshine forwarded partially executed installment collection agreements to Bradley who obtained plaintiffs' signatures and returned the documents to Sunshine. Sunshine then sent the collection authorizations to Minnesota Title. Either Sunshine or Ticom sent the title insurance policies directly to the investors upon Sunshine's execution of first mortgages. Minnesota Title mailed the evidence of a completed collateral assignment of beneficial interest, i. e., its "acknowledgement" of the investor's trust interest, to plaintiffs. Bradley transmitted no funds to either company. Sunshine paid for the defendants' services. Bradley received his commission from Sunshine.

Carl White, associate counsel and assistant vice-president of Ticom, Benny Gonzales, trust officer of Minnesota Title, and Kenneth Mattison, former trust officer of Minnesota Title, testified that they had never heard of Art Bradley before this lawsuit. Mr. White testified that his search of company records yielded no evidence that Art Bradley had served as an agent or representative of either company. The plaintiffs failed to present any direct proof that either defendant knew of Art Bradley's existence and activities.

Plaintiffs urge that defendants must have known that Sunshine was selling the securities, and that it is reasonable to impute knowledge to the defendants that such sales were made by brokers or agents. Because defendants accepted orders for title insurance and collection services, plaintiffs reason that the companies accepted the benefits of Art Bradley's conduct and ratified it. However, all communications and orders came to Ticom and Minnesota Title from Sunshine, their client, and such orders requested essentially ministerial acts, such as examining titles, recording mortgages, transferring funds owed to Sunshine to the accounts of others. It is unreasonable to expect the defendants to repudiate fraudulent behavior of which they were unaware.

The Court finds that plaintiffs have not sustained their burden of proof as to the alleged agency relationship between defendants and Art Bradley. Furthermore, the plaintiffs have failed to prove that these defendants knew or should have known that the sales of investment contracts by Art Bradley and John Mihlik were accompanied by fraudulent representations and that Ticom and Minnesota Title were being represented as participants in the sale or as some sort of guarantors of the securities.

Defendants are charged with the failure to disclose certain material facts which will be discussed below. There is no evidence whatever that Ticom or Minnesota Title possessed an intent to deceive, manipulate or defraud the plaintiffs. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Shull v. Dain, Kalmon & Quail, supra*, at 156. Scienter is an essential element of a suit based on section 10(b) and Rule 10b–5. Even if defendants had a duty to disclose such information, it is clear that merely negligent breach of such duty would not subject the defendants to liability. *Ernst & Ernst v. Hochfelder, supra.*

Recent interpretations of *Ernst & Ernst v. Hochfelder, supra*, leave open the possibility that reckless disregard of duty may suffice as scienter under section 10(b) and Rule 10b–5. *See Sundstrand Corp. v. Sun*

with an appraised valuation in excess of the mortgage thereon." Moreover, he described Phoenix Valley West in glowing terms alleging that improvements had been made and would continue, while in fact the subdivision was and remained completely unimproved desert land.

*Chem. Corp.,* 553 F.2d 1033, 1039–47 (7th Cir. 1977). As the law is unclear in this area, the Court will make specific findings as to defendants' duty to disclose the alleged omissions and whether such nondisclosure was in reckless disregard of duty.

On March 24, 1972, both defendants received a subpoena duces tecum from the S.E.C. requesting all records of Sunshine and its officers. On April 4, 1972, two investigators from the S.E.C. visited the offices of Minnesota Title and spent several days inspecting the subpoenaed records. The evidence conflicts as to what, if any, information the investigators provided officers of Minnesota Title about the purpose of the inspection. William Hegan of the S.E.C. testified that he "might" have told John Karmelich, local house counsel for Ticom in Arizona, that Sunshine was under investigation for "possible" violation of federal securities laws. Benny Gonzales assisted the investigators during their visit. He testified that they were very secretive, studied the files in a closed room, provided no information and then left. Plaintiffs allege that defendants should have notified them of the S.E.C.'s investigation of Sunshine's files, particularly as to those plaintiffs who purchased securities after April, 1972.

Benny Gonzales testified that other investigators regularly check the records of Minnesota Title's clients and that unless some action is taken or instructions provided, the company does not disclose such investigations. Kenneth Mattison testified that during his employment by Minnesota Title, the company considered such inspections a private matter between the client and the investigating agency unless the company was notified of specific action. Such periodic investigations are conducted by the Internal Revenue Service, the Arizona Real Estate Commission, the State Insurance Department, the State Banking Department, the Interstate Land Sales Commission and the Arizona Sheriffs' Department, as well as the S.E.C.

Plaintiffs contend that defendants should have notified investors that Sunshine was mortgaging the trust property for amounts far in excess of its original cost to Sunshine or its value. Kenneth Mattison testified that it is not unusual for land to be mortgaged by a developer for a greater amount than its purchase price. Such mortgages may be taken for the purpose of financing improvements of the property, and title insurers and subdivision trustees do not question the practice. Moreover, he testified that title insurance companies do not appraise land. No title insurers employ such appraisers, and he had never heard of a title insurer questioning the discrepancy between the purchase price of land and the mortgage amount.

The customary practice of a company or an industry is not conclusive proof of its legal duty or of the degree of carelessness with which such duty has been disregarded. However, such evidence is a highly relevant consideration. The Court cannot conclude on the basis of the evidence presented that Ticom or Minnesota Title had a duty to notify the plaintiffs and others similarly situated of the S.E.C. investigation of April, 1972 or the discrepancy between the cost of Sunshine's land and the mortgage amounts. Nor have plaintiffs established that this information alerted defendants to Sunshine's fraudulent practices. Even if the defendants had a duty to disclose this information or to investigate further, their failure to do so was not "reckless." *See Sundstrand Corp. v. Sun Chem. Corp., supra,* 553 F.2d at 1045, *citing Franke v. Midwestern Okl. Development Authority,* 428 F.Supp. 719 (W.D.Okl.1976):

"reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

In 1971, cease and desist orders were issued in several states enjoining Sunshine's sale of securities. There is no evidence that either Ticom or Minnesota Title was aware

of these orders or that they should have known of them.

In July, 1972, in the United States District Court for the Northern District of Illinois, Sunshine consented to the entry of an injunction against its sales of investment contracts. The S.E.C. never formally notified Ticom or Minnesota Title of this injunction; however, there is evidence that Benny Gonzales may have learned about it on January 9, 1973. By June 9, 1972, all of the plaintiffs had purchased their investment contracts, although Sunshine continued to replace lot buyer notes until 1974. The Court finds that the defendants' failure to disclose the S.E.C. injunction against Sunshine after January 9, 1973 was negligent at most, but not reckless. Moreover, all sales had been completed.

Plaintiffs charge that defendants failed to notify investors that Sunshine conducted no credit investigations of the lot buyers. There is no evidence that defendants knew of this fact.

In addition, plaintiffs contend that defendants had a duty to disclose the high delinquency or default rate on such lot buyers' notes. The plaintiffs have not explained the source of such duty. Moreover, investors in these securities had a recourse agreement with Sunshine and accepted replacement notes and mortgages. When Minnesota Title received less money from the lot buyers than the amounts to be transmitted to the investors, Sunshine made up the difference. Sunshine, not Minnesota Title, administered the replacement of defaulted or prepaid notes.

In 1974, Sunshine began to default on its obligations to investors when lot buyers prepaid, paid off or defaulted on their notes. Sunshine had become unable to substitute new notes because of its legal and financial difficulties. In late 1974, as Minnesota Title became aware of Sunshine's default to its investors, the company, as collection agent, impounded all incoming funds and held them for the investors instead of for Sunshine. The Court finds that even if Minnesota Title should have taken such action earlier, its failure to do so was not reckless.

Finally, documents executed by Minnesota Title contained disclaimers which were adequate to notify the plaintiffs that the company did not purport to guarantee or safeguard plaintiffs' investments in any way. The collection agreements for assigned lot buyer notes provided that:

The sole obligation of Collection Agent shall be to (1) receive the payments due under the note and mortgage and remit the payments thereon to the Assignee, (2) keep a record of payments received and disbursed, and (3) hold the duplicate and executed copy of the promissory note and Release and Satisfaction of Mortgage in the manner above provided. Any other services rendered by Collection Agent shall be as an accommodation only, and Collection Agent shall incur no responsibility or liability if it fails in any manner to perform such services.

. . . . .

Assignor (Sunshine) hereby authorizes and instructs Collection Agent to make such payments to Assignee from the Assignor's trust cash account with Collection Agent, or if such account is insufficient to make such payments, to make same from such other funds as may become available to Collection Agent for the benefit of Assignor.

. . . . .

Collection Agent acts only as Collection Agent and assumes no responsibility beyond its exercise of due care.

The trustee receipts or acknowledgements of collateral assignments of beneficial interest stated that acknowledgement by the company

1. In no way constitutes a guarantee or promise that sufficient funds will be available in trust to pay same;

2. Imposes no obligation to recognize such assignment other than to the extent funds are available in trust to pay the full amount of assignment and;

3. Shall in no way prevent close of the trust involved because of insufficient funds to pay this assignment.

The Court concludes that Ticom and Minnesota Title incurred no liability to the plaintiffs under section 10(b) and Rule 10b–5 of the 1934 Act.

In addition, the Court finds that Ticom and Minnesota Title did not aid or abet Sunshine's violation of Section 10(b) and Rule 10b–5. The question of their duty to disclose material facts has been discussed, and plaintiffs presented no evidence from which the Court could find that defendants knew or should have known of Sunshine's fraud. *See Hirsch v. duPont*, 553 F.2d 750, at 759 (2nd Cir. 1977); *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, at 826 (E.D.Wis.1977).

*Common Law Fraud*

Plaintiffs' fourth cause of action charges all of the defendants, including Sunshine, with fraudulent misrepresentations and breach of duty to disclose known facts in connection with the practice by Sunshine of replacing defaulted and prepaid assigned lot buyer notes with other forms of securities. Most of these events arose out of Sunshine's final effort to keep itself in business in the face of financial distress in 1973 and 1974. The plaintiffs have not proved that they were induced by reliance on statements or material omissions by Ticom or Minnesota Title to act or that they were damaged by the conduct of these defendants. Throughout this lawsuit plaintiffs have unsuccessfully attempted to attribute Sunshine's conduct directly to Ticom and Minnesota Title.

Plaintiffs have pointed to no misrepresentations by either of these defendants which were known by the defendants to be false or by which they intended to deceive the plaintiff. Moreover, plaintiffs have broadly alleged that these defendants were subject to a duty to disclose information, most of which the evidence clearly shows they did not know. The Court rejects the plaintiffs' theory that either Ticom or Minnesota Title is liable to the plaintiffs under the theory of common law fraud.

Judgment will be entered in accordance with this Memorandum Opinion in favor of defendants, Title Insurance Company of Minnesota and Minnesota Title Company.