Henry T. WRIGHT and Helen F. Wright, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Darrell Marlow SCHOCK, et al., Defendants.

No. C–81–4127 RFP.

United States District Court, N.D. California.

June 30, 1983.

644

Robert L. Lieff, Jonathan J. Wilcox, Elizabeth Joan Cabraser, Mills & Wilcox, San Francisco, Cal., Lloyd Hinkelman, Paul W. Tozer, Donald W. Fitzgerald, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, Cal., for representative plaintiffs.

Stanford H. Atwood, Jr., Robert Knox, Atwood & Hurst, San Jose, Cal., for defendant Title Ins. Co. of Minnesota.

Burton S. Levinson, Lawrence R. Lieberman, Patricia M. Snyder, Levinson & Lieberman, Inc., Beverly Hills, Cal., for defendants First American Title Ins. Co. and St. Paul Title Ins. Co.

Kenneth G. Hecht, Jr., David J. Goss, Rubin, Eagan & Feder, San Francisco, Cal., for defendant Transamerica Title Ins. Co.

Edmund L. Regalia, John G. Sprankling, Richard G. Carlston, Miller, Starr & Regalia, Oakland, Cal., for defendant Safeco Title Ins. Co.

Frank E. Sieglitz, Kirke M. Hasson, Stephen Stublarec, Robert A. Gordon, Jr., Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant Chicago Title Ins. Co.

Arthur R. Albrecht, John N. Hauser, George Grellas, Stephen B. Yoken, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant Title Ins. and Trust Co.

Ervin, Cohen & Jessup, Beverly Hills, Cal., for defendant Commonwealth Land Title Ins. Co.

Paul J. Matzger, Michael H. Love, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, San Francisco, Cal., for defendant Western Title Ins. Co.

Gregory L. McCoy, Thiessen, Gagen & McCoy, Danville, Cal., for defendant Diablo State Bank.

Charles P. Shea, Cesari, Werner & Moriarty, John Hosack, Paul E. Gaspari, Keith A. Kandarian, Tobin & Tobin, San Francisco, Cal., for defendants The Hibernia Bank, successor by merger to Security Nat. Bank and Sec. Nat. Bank.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

Plaintiffs Henry and Helen Wright brought this action on behalf of themselves and all others similarly situated alleging violations of federal and state securities laws and common law fraud in connection with their purchase of promissory notes secured by deeds of trust on real property, offered to them by an entity known as Golden State Home Loans ("GSHL"). They have named as defendants Darrell Schock, the President of GSHL and his wife, Jean Schock, the sole shareholders of GSHL; some 63 other individuals bearing various relationships to the acts alleged in the complaint; two banks (three are listed in the caption, but one is a successor of another); and nine title companies. Plaintiffs allege that they and other members of the proposed class have suffered losses of funds

invested with GSHL as well as the loss of expected interest earnings. They seek both actual and punitive damages.[1]

Defendant title companies—Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, First American Title Insurance Company, Safeco Title Insurance Company, St. Paul Title Insurance Company, Title Insurance and Trust Company, Title Insurance Company of Minnesota, and Transamerica Title Insurance Company ("the title company defendants")—and defendant banks—Diablo State Bank and The Hibernia Bank ("the bank defendants")—brought on motions for dismissal or summary judgment of the above-entitled action on two separate and independent grounds. The defendants contended that the transactions between plaintiffs and GSHL did not involve the purchase or sale of "securities" within the meaning of the federal securities laws and that this court, therefore, lacked subject matter jurisdiction of the action. These defendants further contended that even if the subject transactions were found to involve securities, as a matter of law no securities liability could attach to the involvement of the title company and bank defendants in these transactions. Plaintiffs brought on their own motion for partial summary judgment, asking the court to find as a matter of law that the transactions in question involved securities within the reach of the federal securities laws.

Following the hearing, and upon further review of the enormous mass of material submitted with the motions, the court is inclined toward the view that the offer and sale of some, if not all, GSHL trust deed investments (accepting plaintiffs' nomenclature for the transactions) was an offer or sale of securities. The record on this issue is in need of supplementation, however, so the court will not grant plaintiffs' motion. The court finds, rather, that the issue of securities characterization presents questions of material fact sufficient to sustain

the court's continuing jurisdiction over this action and to preclude dismissal or summary judgment for defendants on this ground. The court does grant summary judgment to the bank and title company defendants on the other ground—that plaintiffs have failed to present any evidence that would show the existence of a genuine issue of fact as to securities law violations by these defendants.

## I. SECURITIES CHARACTERIZATION

### A. Statement of Facts

GSHL was a California corporation, headquartered in Hayward, that operated from 1974 through May, 1981. Beginning in 1979, it operated branch offices in a number of California cities. GSHL was licensed by the California Department of Real Estate as a mortgage loan broker. It was in the business of brokering loans secured by deeds of trust on real property. It earned fees by charging a commission to borrowers. GSHL advertised trust deed investments in newspapers, by telephone, through investment seminars, and by mail.

Plaintiff Henry T. Wright was and is employed as a senior engineer at Lockheed. In the fall of 1980, he saw newspaper advertisements by various mortgage brokers and became interested in the possibility of investing in loans secured by trust deeds brokered through one or another brokerage company. In November, 1980, Wright attended a seminar on trust deeds offered by defendant Jan Robblin on behalf of GSHL at the Lockheed premises. Among the topics covered in the seminar were the differences between trust deeds and mortgages, the documents that were required of a prospective borrower, and the title search and appraisal that would be undertaken by GSHL or its agents. Specific loan opportunities were not discussed at the seminar.

Thereafter, Ms. Robblin communicated with Mr. and Mrs. Wright by phone and in writing, at one point sending the Wrights a

---

**1.** The complaint asks in the alternative for rescission of plaintiffs' transactions with GSHL. As GSHL is in receivership and is not even named as a defendant, this form of relief is a practical impossibility.

copy of a promotional newsletter entitled "Financial Outlook." On January 8, 1981, Ms. Robblin visited the Wrights in their home and offered them seven possible loans to invest in. They personally selected four of these, executing the necessary documents and giving Ms. Robblin a check for $125,000. The Wrights loaned $31,000 on a third trust deed to a Mr. and Mrs. Del Rosario, secured by rental property in Berkeley; $30,300 to Cole & Wolff Construction Company and GSHL in joint venture, participating with 55 other investors in a loan secured by a first trust deed on property in Rohnert Park that was intended for condominium development; $52,000 to Dr. Charles S. Nicholson II, in a participation loan involving 35 other investors, secured by a third trust deed on a dental building in San Leandro, and $11,700 to a Mr. Ghorban, secured by a third trust deed on property in Alamo.

The investment entered into by plaintiffs had the following characteristics as testified to by Mr. Wright at his deposition. All the money was allocated to the four specific loans. GSHL was to handle the escrow on the loans through a bank. Plaintiffs executed a servicing agreement, terminable by them on 30 days notice, under which GSHL would collect borrowers' payments and remit them to the Wrights, and under which GSHL could in its discretion advance payments to the Wrights, subject to reimbursement, if borrowers paid late; GSHL also agreed to bid in at any foreclosure sale the amount outstanding under the note (we note that GSHL promotional literature spoke of a *policy* of making advances to cover late payments and did not mention reimbursement). The plaintiffs had no obligation to invest further funds. The loan payments were to be paid to the Wrights rather than reinvested.

Sometime during or after plaintiff's investment, GSHL began running into difficulties. It may have continued for too long its policy of advancing interest payments on late or defaulting loans. It allegedly drew for this purpose on funds from escrow accounts, which were intended to fund loans that were waiting to close. Some checks for interest payments advanced to investors by GSHL, including at least one to plaintiff, were returned for insufficient funds. A DRE investigation ensued, and, ultimately, the Alameda County Superior Court imposed a receivership on May 21, 1981. Plaintiffs have received payment for one of their loans, the Ghorban loan, under a title insurance policy, because of a mistake in the title report. One loan, the Del Rosario loan, is being managed at this point by the plaintiffs themselves. Other relevant facts are incorporated into the discussion.

## B. Discussion

### 1. Definition of a security.

The statutory definitions of a "security" in the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 ("the Exchange Act") are sweeping. The Securities Act's definition provides:

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Securities Act § 2(1), 15 U.S.C. § 77b(1). The Exchange Act's definition is very similar, except that it expressly excludes "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months." Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10). Courts have usually treated the two statutes as having coextensive application. *See United Housing Foundation, Inc. v. Forman,* 421 U.S. 837,

847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

A literal application of the statutory definition, which includes "any note," would sweep up not only plaintiffs' investment, but any note secured by a mortgage or deed of trust on real property. Plaintiffs do make such a literalist argument at one point in their memorandum, though without much apparent conviction. Both definitional provisions are prefaced by the phrase, "unless the context otherwise requires." Courts have used this statutory invitation to judicial elaboration to exclude from the coverage of the securities laws lending transactions that Congress clearly did not intend to reach. *See Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1138 (2d Cir.1976); *Wolf v. Banco Nacional de Mexico,* 549 F.Supp. 841, 850–52 (N.D.Cal. 1982). It has never been held, and the court does not understand plaintiffs to argue, that an ordinary loan secured by real estate is a security.

Defendants contend that ordinary real estate loans, arranged through a mortgage loan broker, are all that is involved in this case. Plaintiffs, however, maintain that the facts here are similar to those in cases which have held various real estate-backed instruments to be securities. *See United States v. Farris,* 614 F.2d 634 (9th Cir.1979), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); *Los Angeles Trust Deed & Mortgage Exchange v. SEC,* 285 F.2d 162 (9th Cir.1960); *Lingenfelter v. Title Ins. Co. of Minn.,* 442 F.Supp. 981 (D.Neb.1977); *SEC v. Lake Havasu Estates,* 340 F.Supp. 1318 (D.Minn.1972). The courts in these cases considered whether the transaction before them constituted an "investment contract"—a statutory term which, ever since the seminal case of *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), has been the focus of most judicial efforts to determine the boundaries of securities law coverage.

In *Howey,* the promoters offered investors the opportunity to purchase strips of citrus trees and service contracts in which the promoters undertook for a fee plus costs to care for, harvest, and market the crops. The court found that this arrangement constituted an "investment contract" within the meaning of the securities laws, formulating the classic definition of the term as follows:

[A] contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.

328 U.S. at 298–99, 66 S.Ct. at 1102–03. This definition, the court stated,

permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of "the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.Rep. No. 85, 73rd Cong. 1st Sess. p. 11. It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*Id.*

In *United Housing Foundation, Inc. v. Forman, supra,* the Court restated the *Howey* formula and affirmed its continuing vitality. In *Forman,* the Court held that shares of "stock" in a cooperative low income housing project, which had to be purchased at a fixed price as a condition of occupancy, sold at the same price upon departure, and which carried no dividends or other privileges, were not securities. The Court reiterated earlier statements that a determination of securities characterization should be based not on the literal terms of the statute but on "the economic realities underlying a transaction." 421 U.S. at 849, 95 S.Ct. at 2059. The *Howey* test, said the Court,

in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

*Id.* at 852, 95 S.Ct. at 2060. The elements of the combined *Howey-Forman* test can be stated as follows: 1) investment of money, 2) in a common enterprise, 3) with profits expected from the entrepreneurial or managerial efforts of others.

Like the *Howey* investors who purchased more than a land sale contract and a service contract, who purchased "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise," 328 U.S. at 299, 66 S.Ct. at 1103, plaintiffs claim that they purchased more—critically more—than a simple promissory note secured by an interest in real property. They contend that they purchased bundles of rights and services which, viewed as an integrated package, meet the *Howey* test of an investment contract. According to plaintiffs, the GSHL package consisted of the promissory note, the deed of trust, the selection and qualification of borrowers, title insurance, management and administration of loans, guarantee of monthly loan payments, and the promise of foreclosure services and guaranteed return of investor funds. Plaintiffs rely on cases in which courts have held investment packages of various sorts, some involving real property-secured notes, to be securities. Defendants argue that the cases relied on by plaintiffs are all distinguishable from the present case. They assert that in fact GSHL offered primarily a brokerage service for individual investors involved in an "individual enterprise."

The first of the three *Howey-Forman* elements—an investment of money—is clearly satisfied here. This element might pose a problem where the consideration furnished was other than money, but here plaintiffs gave a check. At least one defendant suggests, however, that whether plaintiffs made an "investment" depends on a weighing of the factors employed by the Ninth Circuit in its "risk capital" cases. *See Am-*

*fac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426 (9th Cir.1978); *United California Bank v. THC Financial Corp.,* 557 F.2d 1351 (9th Cir.1977); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir.1976); *El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

The problem in these cases has been distinguishing an investment of "risk capital" from a "risky loan." The transactions involved have been negotiated loans or have involved a commercial lender or both.[2] The Ninth Circuit has given the following summary of the risk capital test:

> [T]he ultimate inquiry is whether [the plaintiff] contributed "risk capital" subject to the entrepreneurial or managerial efforts of others. This approach encompasses the economic realities standard and the *Howey* test which have been utilized by the Supreme Court in [*Forman*].

*Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc., supra,* 583 F.2d at 432 (citations omitted).

The risk capital test is thus an adaptation and elaboration of *Howey* which is particularly applicable to the characterization of certain types of transactions. It can lead and most often has led to the conclusion that a given transaction is not an investment in securities but a commercial loan. "Risk capital" is not, however, a test that can short-circuit the *Howey* inquiry in the context of this case. For purposes of applying the *Howey-Forman* test, plaintiffs have made an "investment" in the ordinary usage of the term—they put up their savings on the promise of a return.

### 2. *"Common enterprise" element.*

The Ninth Circuit has defined a "common enterprise" as "one in which the fortunes of

---

**2.** In *Great Western Bank & Trust Co. v. Kotz, supra,* the court developed a list of factors to be employed in the analysis. They were: (1) length of term—longer term tending to favor finding an instrument a security; (2) collateralization—an unsecured instrument favoring a security characterization; (3) form of the obligation; (4) circumstances of issuance—wheth-

er to a single party or to a class of investors; (5) relationship between the amount borrowed and the size of the borrower's business—the larger the amount, the greater the risk; (6) contemplated use of funds—whether enterprise formation or ongoing business financing. The court added that other factors might be present in another case. 532 F.2d at 1257–58.

the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *SEC v. Glenn W. Turner Enterprises Inc.,* 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53. The requirement in the Ninth Circuit is one of "vertical commonality," that is, "that the investor and the promoter be involved in some common venture without mandating that other investors also be involved in that venture." *Brodt v. Bache & Co., Inc.,* 595 F.2d 459, 461 (9th Cir.1980).

Plaintiffs claim that the Wrights' investment success was linked in many ways to GSHL's continuing viability, emphasizing in particular GSHL's ability to make good on its guarantees as well as "the skilled managerial efforts of GSHL's personnel at every critical juncture of the venture." Defendants argue that the evidence shows that GSHL made no guarantees, that GSHL acted solely as a broker or agent, and, therefore, that GSHL's fortunes were not interwoven with those of the Wrights.

Two decisions of the Ninth Circuit frame the "common enterprise" issue: *Brodt v. Bache & Co., Inc., supra,* and *United States v. Carman,* 577 F.2d 556 (9 Cir.1978). In *Brodt,* plaintiff, an individual, liquidated his stock portfolio on the solicitation of a Bache representative and invested the proceeds in a discretionary commodities account with Bache. Bache representatives were authorized to trade freely for the account without notifying the investor. Eventually, all of plaintiff's funds were lost, and plaintiff sued, claiming that the discretionary commodities account was a security. The court held that while the first and third elements of the *Howey* test were met, the common enterprise element was not.

The *Brodt* court distinguished *Carman.* In *Carman,* a trade school sold packages of federally insured student loans to a credit union. Although the loans were federally insured and bore a fixed rate, the investor had a risk of loss that depended on the success or failure of the school, because the investment package included a repurchase clause and a guarantee that the school would cover refund liability for students who dropped out of school. The dependence of the investor on the success or failure of the school gave rise to a common enterprise.

In *Brodt,* the risk involved in the investment was completely independent of Bache's success or failure. Bache could reap and, in fact, had reaped large commissions while the investor's account was wiped out. Bache's best efforts would not guarantee a return to Brodt; weak efforts might limit his success, but would not necessarily cause him losses. As the court summarized its holding in a later case involving the same issue, "Under *Brodt,* there is no common enterprise unless there is some direct relation between the success and failure of the promoter and that of his investors." *Mordaunt v. Incomco,* 686 F.2d 815, 817 (9th Cir.1982).

Some form of guarantee linking the expectations of the investor to the fate of the promoter has been critical in Ninth Circuit cases finding an investment contract where real estate-backed notes were the investment vehicle. *See United States v. Farris, supra,* 614 F.2d at 641 (as in *Carman,* promoter not only agreed to act as collection service on notes, but also promised to pay off principal in cash at noteholder's option in event of default); *SEC v. Los Angeles Trust Deed & Mortgage Exchange v. SEC, supra,* 285 F.2d at 172 (promoters' representations amounted to "an implied guarantee against loss").

GSHL's promotional literature advertised among its services to investors that

3. If the borrower fails to remit the monthly installment, it is GOLDEN STATE HOME LOANS [sic] policy to advance the stipulated monthly installment amount at no cost to the investor.

. . . . .

5. In the case of a default, upon conclusion of the reinstatement period, investors may opt to have their principal balance returned with interest to the final date.

Plaintiff's Exhibit 2 at 5. The brochure also makes the statement that

"[b]ecause of the care exercised when arranging and servicing loans, [GSHL] can state, with justifiable pride, that none of our lender clientele has ever lost a penny of accrued interest and principal on any loan arranged by our company.

*Id.* Plaintiffs argue that they relied on the guarantees contained in these representations in deciding to invest through GSHL, creating that dependency on the fortunes of GSHL which manifests a common enterprise.

Defendants counter that the loan servicing agreement, which Mr. Wright testified he had read before signing, stated that advances by GSHL to investors or senior lienors were at "its sole discretion" and subject to reimbursement. Defendants also point to deposition testimony by Mr. Wright that he knew he might personally be called upon to advance funds to a senior lienor to protect his lien. Thus, defendants conclude that GSHL did *not* guarantee plaintiffs' investment and that plaintiffs knew this.

█ It is certainly true that GSHL did not contractually bind itself to advance funds or to forestall or make good on investors' losses, but this is not determinative of the issue. No case holds that a legally binding guarantee is essential to interweave the fortunes of investor and promoter. Indeed, in the *Los Angeles Trust Deed* case, the guarantee element referred to by the court was "the company's *policy* to repurchase any delinquent trust deed." 285 F.2d at 168 (emphasis added). As noted above, this constituted "an implied guarantee against loss." *Id.* at 172. As the Supreme Court has frequently admonished, "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

█ The question in this case is whether the economic realities underlying the transactions reflect an interdependence of promoter and investor. There is ample evidence in the record from which the trier of fact could find such an interdependence. Plaintiffs' Exhibit 12 is a copy of a check for interest on one of plaintiffs' loans, advanced by GSHL and returned by the bank for insufficient funds. This is evidence of the financial debacle which has swept up both GSHL and many of its investors. Defendant Schock admitted in a letter to investors (Plaintiff's Exhibit 15) that GSHL had "*invested*" over $600,000 in advances to investors. That GSHL was not contractually bound to make these advances pales to insignificance beside the economic reality that, from a business standpoint, GSHL evidently viewed such advances as an essential part of the "economic inducement" to investors, even to the point, apparently, of jeopardizing its own financial health to continue making them.

Moreover, the guarantee question, while of central importance, is not necessarily determinative. In the *Los Angeles Trust Deed* case, for instance, the court based its finding of a common enterprise on a much broader range of factors:

We find that the economic welfare of the purchasers is inextricably interwoven with the ability of LATD to locate by the exercise of its independent judgment a sufficient number of discounted trust deeds, and the ability of LATD to subsequently meet its commitments, to check, evaluate, supervise, and supersede.

285 F.2d at 172. While there are factual distinctions between the *Los Angeles Trust Deed* arrangement and the GSHL program, many of these factors apply here as well. The letter from the GSHL receiver, Thomas Stark, to investors (Plaintiffs' Exhibit 13), although hearsay for purposes of this motion, indicates that many investors have suffered losses; even those whose entire investment has not been wiped out have endured prolonged delays in obtaining control over their loans and have had their interests charged with receivership costs. A detailed review of the evidence is unnecessary at this time. The causal interrelationships between GSHL's collapse and investor losses are sufficiently suggestive .of

economic interdependence to justify further inquiry and to preclude summary judgment for defendants under the theory that no common enterprise and, hence, no investment contract is present here.

3. *Profits anticipated through the entrepreneurial and managerial efforts of others.*

Two arguments are raised under this prong of the *Howey* test against finding GSHL's trust deed investments to be securities. One—that plaintiffs' expected return from these investments cannot be considered "profits"—can be given fairly short shrift. The other argument—that plaintiffs' anticipated profits were not the result of the entrepreneurial or managerial efforts of others—requires somewhat more discussion.

Some defendants argue that because plaintiffs' expected return on their investment took the form of a fixed rate of interest, this return is not "profit" within the meaning of the *Howey* test. This argument relies on the following passage from *United Housing Foundation, Inc. v. Forman, supra:*

> By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in [*SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943)] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is "attracted solely by the prospects of a return" on his investment. [*Howey.*]

421 U.S. at 852, 95 S.Ct. at 2060. The *Forman* court was not, of course, confronted with the question posed here. The forms of purported profits rejected in *Forman* were deductions for mortgage interest, paying a below-market rent, and the possibility of rent reductions from leasing commercial space in the co-op project. The latter was rejected as speculative and insubstantial.

The Ninth Circuit, on the other hand, has consistently treated fixed rates of return as "profit" for purposes of *Howey* analyses. *See, e.g., United States v. Farris, supra; United States v. Carman, supra; Safeway Portland Employees Federal Credit Union v. C.H. Wagner & Co., Inc.,* 501 F.2d 1120 (9th Cir.1974); *Los Angeles Trust Deed & Mortgage Exchange v. SEC, supra.* The key point, as the Ninth Circuit's risk capital cases make clear, is that by purchasing a security, whether debt or equity, investors subject their investments to the business risks of the enterprise—albeit to differing degrees.

An essential part of the *Howey-Forman* test is that investors anticipate their return—whatever its form—from the entrepreneurial or managerial efforts of others.[3] In applying this prong of the test, the inquiry is whether the investor is in an essentially passive role vis a vis the promoter and the investment. In *United States v. Carman, supra,* 577 F.2d at 563, the court stated that in addition to certain risks which tied the investor's expectations to the "continuing solvency" of the schools, the service contract "placed investors in a totally passive role with respect to collecting on the notes." In *United States v. Farris, supra,*

---

**3.** The original *Howey* formulation was "*solely* from the efforts of others." In *SEC v. Glenn W. Turner Enterprises, supra,* the court was faced with a pyramid scheme—purchased plans which allowed them to earn "commissions" by bringing new prospects to meetings. A literal application of *Howey*'s "solely" language would have prevented characterizing the plans as investment contracts, since some effort by the purchaser was required to realize the return on his investment. The court held that the *Howey* test should be construed to require that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 474 F.2d at 482. When the Supreme Court revisited the *Howey* test in *Forman,* it appeared tacitly to assent to the modification proposed by *Turner,* omitting "solely" and including the modifiers "entrepreneurial or managerial" before "efforts." 421 U.S. at 852, 95 S.Ct. at 2060.

614 F.2d at 641, the court noted that the investor's "totally passive role" with respect to collection was one of "the crucial factors" underlying the *Carman* court's holding that the loan packages were securities. Although defendants here belittle the importance of GSHL's collection and foreclosure services for investors under the GSHL loan servicing agreement, *Farris* and *Carman* show that these efforts may be sufficiently significant to passive investors to satisfy the "efforts of others" prong of the *Howey-Forman* test.

Defendants argue that the loan servicing agreement between plaintiffs and GSHL could be cancelled at the option of either party on thirty days notice. Since the tasks performed by GSHL under the agreement were essentially ministerial, and since plaintiffs had the option to substitute themselves or any other agent to perform these duties, plaintiffs were either in control or in a position to control the course of their own investment, and were not dependent on the "entrepreneurial or managerial efforts of others." Defendants cite *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), for the proposition that the key factor is whether an investor has the *right* to control his interest, not whether he in fact exercises this right.

*Williamson* addressed the question of when, if ever, an investor in a general partnership or joint venture can establish that his interest was a security. The court stated:

> [A]n investor who claims his general partnership or joint venture interest is an investment contract has a difficult burden to overcome. On the face of the partnership agreement, the investor retains substantial control over his investment and an ability to protect himself from the managing partner or hired manager. Such an investor must demonstrate that, in spite of the partnership form which the investment took, he was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers.

*Id.* at 424. The relevance of partnership powers to GSHL's mass marketed trust deed investments may be questioned. We may take instruction, however, from one of the *Williamson* court's examples of how the burden of establishing dependence might be met: a case in which "the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers." *Id.*

In one of the cases relied on in *Williamson, Fargo Partners v. Dain Corp.,* 540 F.2d 912 (8th Cir.1976), the purchaser of an apartment complex entered into a management contract with the vendor terminable on 30 days notice. The court held that this was not an investment contract since the power to control the business remained in Fargo's hands. The *Fargo* court expressly stated, however, that it was not dealing with "a case where a small investor is helplessly reliant on the promoter's efforts because of lack of business knowledge, finances, or control over the operation." *Id.* at 915.

Here, despite defendants' efforts to portray Mr. Wright as a knowledgeable investor, who could have easily and at any time dispensed with GSHL's insignificant clerical assistance and assumed full control of his investments, the evidence in the record tends to indicate otherwise. According to Mr. Wright's deposition testimony, his only prior investment experience involved loaning a thousand dollars to a friend to invest in stock of a company that subsequently went bankrupt. Before investing with GSHL, he had his life savings in bank savings accounts and certificates of deposit. In the fall of 1980, in addition to the GSHL seminars, he attended another seminar on trust deed investments put on by Heritage Loans.

The GSHL seminar presentation on the benefits and (to a much lesser extent) the risks of trust deed investment was extremely simplistic and misleading. It left Mr. Wright with the perception that the risk of trust deed investment "was either low or not existent" in that "all these loans were

very carefully selected and qualified and the borrowers all had to put records in that they would pay their money." Wright Deposition Transcript 418 (hereinafter designated "Tr."). Mr. Wright disliked Heritage Loans and determined not to go with them, in part because the people making the seminar presentation "sounded like used car salesmen." Tr. 379. In contrast, Ms. Robblin convinced the Wrights that GSHL was "a reputable and honest firm to deal with." Tr. 530.

Defendants make much of the fact that Ms. Robblin offered plaintiffs seven loans and that they personally selected four, rejecting others on the basis of criteria such as distance of the property from the Wrights' residence, which would make it hard for the Wrights to go and look at the property, age of the housing in the area, and so forth. The Wrights apparently did not ask any hard or detailed questions about the qualifications of the appraisers, the overall financial situation of the borrowers, market trends in the areas where the properties were situated, or possible effects of changes in economic conditions. Ms. Robblin's deposition testimony indicated that she did not have the answers to the hard questions had they been asked and that GSHL discouraged its "account executives" from seeking such information. Their job was to sell. Ms. Robblin did not have to answer any hard questions because the Wrights were already sold, convinced that they had found an easy, virtually riskless way to earn 20% per year on their savings.

Not to belabor the point, at this stage in the litigation there appears to be evidence from which the trier of fact could conclude that the Wrights represented the classic type of the small, naive, passive investor, completely dependent on the superior knowledge and expertise of the promoter. Perhaps even more important than the relative lack of sophistication of the plaintiffs in determining whether the GSHL trust deed investments should be found to be securities is "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the eco-

nomic inducements held out to the prospect." *SEC v. J.M. Joiner Leasing Corp., supra,* 320 U.S. at 352–53, 64 S.Ct. at 124–25. The GSHL promotional brochure informed prospective investors that

> GOLDEN STATES uses its expertise to screen prospective borrowers and their properties so as to provide their investors with only those investment opportunities representing the most secure situation. . . . All work required to administrate the account is performed on behalf of the investor.

Plaintiffs' Exhibit 2 at 5.

This message was reinforced in the investment seminars: the value of the property minus the liens equals the equity cushion; as long as the cushion is at least 20% of value, your investment is safe; we do all the work; you, the investor are fully protected, and you don't even have to pay our fee. As Robblin's "Dear Future Investor" letter (Plaintiffs' Exhibit 11) put it, "This investment is virtually management free." The nature and scope of dependence of the GSHL investors was comparable to that which permitted the Ninth Circuit to find investment contracts in *Carman, Farris,* and *Los Angeles Trust Deed.*

## C. Conclusion

For the reasons stated, the court is disposed to find that the GSHL trust deed investments are investment contracts, but has determined that summary judgment on that issue is inappropriate at this time. In *Carman,* the court stated that,

> [a]lthough characterization of a transaction raises questions of both law and fact, the ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law.

*United States v. Carman, supra,* 577 F.2d at 562. At this point, the evidence regarding the intertwining of investor fortunes with those of GSHL itself remains somewhat sketchy. It may be that by the time of trial, the facts underlying the instant transactions will be sufficiently clear that noth-

ing will remain for the trier of fact, and the court will be in a position to rule as a matter of law on the securities character of the GSHL investments. If disputed facts remain, then "a properly instructed jury can determine if, as a matter of fact, a disputed instrument is or is not a security." *Id.* (*citing Great Western Bank v. Kotz, supra,* 532 F.2d at 1255.[4]

## II. SECURITIES LIABILITY

The title company and bank defendants have moved for summary judgment on all of plaintiffs' claims predicated on various alleged violations of the federal securities laws. Plaintiffs have alleged against both classes of defendant primary liability, secondary (aiding and abetting) liability, and "controlling person" liability for violations of sections 12 and 17 of the Securities Act, section 10(b) of the Exchange Act, and S.E.C. rule 10b–5. Plaintiffs have apparently abandoned their other securities law claims. For purposes of ruling on these motions, it is assumed that the GSHL trust deed investments are securities.

The evidentiary record is substantial. Plaintiffs have taken the depositions of 17 title company employees, 3 bank employees, and 4 former GSHL employees. Defendants have taken plaintiff's deposition and also those of 3 other former GSHL employees. In addition, both sides have employed interrogatories. The record is sufficiently developed that summary judgment may appropriately be granted for both bank and title company defendants. No facts have come to light to indicate that any of these defendants have engaged in anything other than normal commercial transactions. Assuming that GSHL did violate the securities laws, it would be an unprecedented and entirely unwarranted extension of the scope of securities liability to hold these defendants liable.

### A. Statement of Facts

The court's review of the factual record indicates that the differences between the parties at this point in the litigation are really not disputes over facts—much as plaintiffs might like to suggest otherwise—but over what conclusions can appropriately be drawn from the present record, which is without significant conflict.

### 1. GSHL's operations.

GSHL personnel were divided between a "borrower group" and a "lender group." The loan officers and others in the borrower group would check on the credit of potential borrowers, obtain appraisals and preliminary title reports on properties, and generally prepare for the making of a loan. The account executives and others in the lender group would contact potential inves-

---

**4.** Defendants make an argument based on *Gordon v. Terry,* 684 F.2d 736 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983), that even if the GSHL investments are securities as against GSHL itself, because of investors' reliance on the unique expertise of the promoter, they are not securities as against parties, such as the bank and title company defendants, who provided no such unique expertise. Hence, claim the moving defendants, the court lacks securities law jurisdiction over them. *Gordon v. Terry* involved an investment in real estate syndicates by a small number of investors who retained substantial control over the investment. The general rule that partnership or joint venture interests are not securities was thus applicable. The plaintiff had to try to fit himself into one of the narrow exceptions to that doctrine—dependence on the unique expertise of the promoter. *See Williamson v. Tucker, supra,* 645 F.2d at 424.

The court believes that the *Gordon v. Terry* holding should be limited to cases where a unique or negotiated transaction is claimed to be a security. Where an investment opportunity is offered to a wider public, the security character of the transaction should be determined generally, by its "character in commerce," and the legal relationships among various parties to the transaction should be determined as a matter of substantive securities law applied to the facts of their involvement in the transaction. Where, as with the moving defendants here, parties are only peripherally involved, this will be reflected in a conclusion that no securities law liability attaches in the context of the particular securities transaction, rather than a threshold determination that the court lacks jurisdiction over peripheral parties because the securities transaction is not a securities transaction as to them.

tors, usually providing them with a choice among available loans.

If an investor decided to make a loan, he would provide the funding, sign a trust deed deposit, and execute a loan servicing agreement under which an affiliate of GSHL would collect borrower payments and pay them over to the investor. After funding the loan, the investor would receive his "package"—copies of a promissory note and trust deed, a fire insurance policy, and a title insurance policy. Normally, GSHL itself handled the escrow.

### 2. *Title company involvement.*

The involvement of all nine title company defendants with GSHL's investment program was limited to preparation of preliminary title reports, issuance of lenders' title policies, and occasional partial escrow services. The plaintiffs claim that because of the title companies' dealings with GSHL and other mortgage brokerage companies in California, the title companies were on notice as to the nature of GSHL's business. The companies actually knew, plaintiffs say, that GSHL dealt in fractionalized interests in a single note and deed of trust. Plaintiffs also claim that through their sub-escrow work, the title companies received information indicating that loans were being made on distressed property or to financially irresponsible borrowers. The title companies dispute the latter claim, which is inadequately specified and documented, but even if true, it is ultimately irrelevant to any securities liability of the title companies. Plaintiffs' further assert, and the companies do not dispute, that plaintiffs relied on title insurance as part of their investment package, and would not have made their investments without the assurance that title insurance would be provided.

Figures provided by the title companies indicate that some $155,000 in total fees and premiums were earned by title companies on GSHL transactions between 1979 and 1981. Because GSHL for the most part performed its own escrow work, it did not rely primarily on any one title company. Transamerica Title had the largest share of revenues from GSHL transactions—$50,000. Plaintiffs' policies were provided by Chicago Title and Transamerica Title.

### 3. *Bank involvement.*

The complaint names two bank defendants. One bank is actually named as two separate banks—Security National Bank ("SNB") and its successor by merger, Hibernia National Bank. The other defendant bank is Diablo State Bank ("DSB"). From all that appears, both banks carried on no more than an ordinary banking relationship with GSHL and had no direct contact with GSHL investors, except that on a limited number of occasions, individual prospective investors were referred to SNB by GSHL for a reference, and a reference was given.

a. *SNB.* SNB and, later, Hibernia, provided GSHL with checking accounts, lock box arrangements in which investors sent funds directly to the bank rather than through GSHL, and several loans, some to GSHL and some to Schock personally. The loans included six or seven auto loans, an equipment loan, a working line of credit, and a letter of credit secured by a boat. Virtually all of these loans are now in default, and the bank has charged them off.

Plaintiffs point out that SNB's name appears on a Loan Servicing Agreement form used by GSHL as part of its promotional materials. In this document, Plaintiffs' Exhibit 61, GSHL agrees to "nominate" SNB to act as the beneficiary's agent for collection. The Agreement says that the bank will collect payments, deposit them in a client trust account, and remit payment to the beneficiary on the first of each month. The branch manager of SNB's Hayward branch and the person most responsible for SNB's relations with GSHL was David C. Howry. He testified that he did not see this form until mid-May, 1981, and that, so far as he knew, no one had authorized the use of the bank's name on this form, and no one at the bank knew that SNB's name was being used in GSHL promotional materials.

In connection with making loans to GSHL, Howry testified that he reviewed

GSHL's financial statements and tax returns, but that he did not look any further into GSHL's business and did not look at any GSHL loan files.

On perhaps six occasions (none involving plaintiffs), the bank received phone calls from GSHL investors, asking for the bank's reference as to GSHL. Howry testified that he had told a GSHL official that, as with any of the bank's corporate customers, the bank would be willing to act as a credit reference and, upon GSHL's authorization, release account information to persons designated by GSHL to receive it. Thereafter, on each of several occasions, GSHL would telephone the bank and say that an investor would be calling for information. The information provided to the investor by Howry was essentially account experience—the length of time the bank had had the account, the "average balance relationship," and whether there had been any problems with the account. Howry stated that he was not asked by the investors about the business of GSHL. Howry testified that he had told the callers that SNB had experienced no problems with the GSHL account, which was true at the time the statements were made.

Plaintiffs point out that the GSHL accounts were among the top five business accounts at the Hayward branch of SNB and that the GSHL loans were among the top five loans. From this and other facts set forth above, plaintiffs conclude that "more questions are raised than settled by the bank's contention [that its transactions with GSHL were simply ordinary banking transactions]." They argue that Howry "must have known" of the type of operation conducted by GSHL, but are unable to point to any evidence of actual knowledge of specific wrongdoing.

b. *DSB.* GSHL held an initial meeting with DSB in 1980, at which were present Charles Lowell, President of the bank, Werner Gehrke, manager of DSB's Danville office, and Darrell Schock. At the meeting, Schock provided a description of GSHL's business. Subsequently, GSHL opened two accounts with DSB, and, thereafter, obtained a loan for $163,000, secured by an assignment of notes and deeds of trust. Schock also took out personal loans of about $400,000. The $163,000 loan is currently in default, and DSB is a creditor in the Schock bankruptcy proceeding as well.

In addition, GSHL listed DSB, Lowell, and Gehrke as bank references in its promotional literature (as it did also with Howry and SNB). Lowell testified that the bank had never authorized the use of its name by GSHL and that he had never seen, prior to his deposition in this action, the page of this material that listed the bank and him as references.

This is essentially all that appears about the relationship between GSHL and DSB. Plaintiffs protest that they have not been able to depose Gehrke, who was directly responsible for the loans from DSB to GSHL and Schock. Plaintiffs noticed the deposition of DSB under Rule 30(b)(6). They had been told by Schock several months previously that Gehrke continued to work at the bank, and they assumed that he would be produced at the bank's deposition. Six days prior to the deposition, plaintiffs inquired orally of DSB whether Gehrke would be produced. At that time they learned that Gehrke was no longer employed by DSB. Thus, only Lowell was produced. Evidently, there was insufficient time left before the discovery cutoff for plaintiffs to locate and depose Gehrke. They urge "that reasonable inferences can be raised from the facts which are available, which demonstrate that Gehrke's testimony at trial would further implicate Diablo State Bank." For one thing, plaintiffs would infer that Gehrke may have seen the GSHL promotional literature and may have given approval for the use of DSB's name as a reference. Plaintiffs also infer a "significant relationship" between Schock and Gehrke.

From the foregoing, and from the fact that DSB "served as an escrow depository for a significant period of time," plaintiffs would draw the conclusion, as they did also with SNB and the title companies, that "Diablo State Bank knew, or should have

known, the nature of the GSHL business and knew, or should have known, of the securities laws violations being practiced by GSHL, and its related entities and principals."

### B. Discussion

#### 1. *Section 12 liability.*

█ Section 12 of the Securities Act, 15 U.S.C. § 77*l*, prescribes liability for "any person who offers or sells a security" in violation of section 5 (forbidding sale of unregistered securities) or by means of a prospectus which includes an untrue statement or omission of a material fact.[5] Both title company and bank defendants are alleged by plaintiffs to have violated this section. The principal issue is whether the moving defendants can be brought within the statutory phrase "any person who—offers or sells a security."

At present, the courts are split on how expansively section 12 should be read. Some courts favor a requirement of "strict privity," under which a purchaser of a security could recover only from his immediate seller. This view has been espoused by the Third and Seventh Circuits. *Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3d Cir. 1979). *Accord, Sanders v. John Nuveen & Co., Inc.,* 619 F.2d 1222, 1226 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981) (stating, in *dictum,* that the "statute explicitly requires privity). The Fifth Circuit has allowed a defendant who was not the immediate seller to be held liable where the defendant was a "substantial factor" in inducing the sale. *Hill York Corp. v. American International Franchises,*

*Inc.,* 448 F.2d 680, 692 (5 Cir.1971). The Ninth Circuit seemed at one point to endorse this "substantial factor" test, *SEC v. Murphy,* 626 F.2d 633, 649–51 (9 Cir.1980), although it has since indicated doubts over its continuing viability. *Admiralty Fund v. Jones,* 677 F.2d 1289, 1294 n. 3 (9 Cir.1982).

Plaintiffs concede that under the strict privity test their section 12 claims against the banks and title companies cannot succeed, but even the broader substantial factor test does not sweep the title company and bank defendants into the net of section 12. The title reports, availability of title insurance, and escrow services of the title companies, and the account services, loans, and generalized references of the banks may have been "but-for" causes of GSHL's sales of securities, but they most assuredly are not proximate causes or substantial factors in such sales. These defendants performed routine services in the ordinary course of business. For any particular sale of an investment, neither the particular title company nor the particular bank involved was in any sense a necessary participant, since any other title company or bank could have provided identical services.

A review of the substantial factor cases shows that a much greater degree of involvement is necessary to establish section 12 liability than simply the provision of routine, though necessary services. *See Admiralty Fund v. Jones, supra* (issue of fact presented as to liability under substantial factor test of attorney who attended meetings at which transaction was structured, wrote opinion letter, and participated in final arrangements for sale); *SEC v. Murphy, supra* (defendant who was the princi-

---

**5.** Section 12 of the Securities Act, 15 U.S.C. § 77*l*, provides in full as follows: "Any person who—(1) offers or sells a security in violation of section 77e of this title, or (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement or a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circum-

stances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

pal promoter and "architect" of the financing scheme was properly held liable); *Hill York Corp. v. American International Franchises, Inc., supra* (defendant promoters who "were the motivating force behind [the] whole project," 448 F.2d at 693, held liable as sellers under § 12).

Moreover, courts have found section 12 inapplicable to persons much more directly involved in transactions than were the banks and title companies here. *See, e.g., Croy v. Campbell,* 624 F.2d 709 (5th Cir. 1980) (attorney-CPA who helped initiate contact between plaintiffs and developer, who made tax projections and reviewed them with plaintiffs, and who was to receive contingent fee from developer, held not a "seller" under § 12(2)); *Stokes v. Lokken,* 644 F.2d 779 (8th Cir.1981) (lawyer and his former law firm, whose qualifiedly favorable opinion as to non-securities character of transaction was the basis for a clean audit report later quoted in promotional materials, held not subject to § 12).

Plaintiffs have no section 12 case against the bank defendants at all, and they make only the barest pretense of resisting the banks' motions on section 12 liability. Against the title companies, they at least have an argument, albeit one that is barely colorable. Their claim is that since title insurance is an "integral component" of the investment package offered by GSHL, the title companies should be considered "sellers" of the entire package. Defendants point out, only half facetiously, that the same argument could be made against the companies providing lenders' fire insurance on properties securing deeds of trust. In truth, the potential sweep of plaintiffs' theory is breathtaking.

The section 12 liability theory tendered by plaintiffs here was actually offered to and rejected by one court in a case involving similar facts to the present case. *Lingenfelter v. Title Ins. Co. of Minn., supra.* The *Lingenfelter* court, unfortunately, made its result appear to hinge on the fact that the evidence did not show title insurance to be indispensable or a "major inducement" to the sale of the investment con-

tracts, remarking that one plaintiff had no idea what title insurance was. 442 F.Supp. at 991–92. Plaintiffs seize on this remark in an attempt to distinguish *Lingenfelter.* Their argument is that Henry Wright had an opinion about what title insurance was and would not have made his GSHL investment in its absence.

Title insurance cannot be considered a *major* inducement to the Wrights' investment, although it is clear that Mr. Wright did understand the function and importance of title insurance—to insure title as represented. *See* Plaintiffs' Exhibit 39. Mr. Wright was not under any illusion, however, that title insurance insured his *investment,* other than as against title risks. The important point on which this court fully agrees with the *Lingenfelter* court's analysis is that the providers of subordinate and routine services within an investment package do not, by their provision of such services, become "sellers" of the entire package.

The court holds that, as a matter of law, the bank and title company defendants are not "sellers or offerors" under section 12.

### 2. Aiding and abetting a section 12 violation.

We need not linger over this theory. There is considerable doubt that aiding and abetting liability exists at all as to section 12 violations. *See McFarland v. Memorex Corp.,* 493 F.Supp. 631, 647 (N.D.Cal.1980). The courts that have discussed aiding and abetting liability have assumed that it could not extend liability any more broadly than does the "substantial factor" test, and so have not considered it separately. *See Admiralty Fund v. Jones, supra,* 677 F.2d at 1294 n. 4; *Stokes v. Lokken, supra,* 644 F.2d at 784–85; *Pharo v. Smith,* 621 F.2d 656, 669 (5th Cir.1980).

In view of the conclusion that no section 12 liability attaches to the moving defendants, the court need not consider the statute of limitations and intrastate exemption defenses offered by defendants.

3. *Primary liability under anti-fraud provisions.*

■ Plaintiffs claim that bank and title company defendants are liable to them for violations of the anti-fraud provisions of the securities laws, section 10(b) of the Exchange Act[6] and rule 10b–5 under it,[7] and section 17(a) of the Securities Act.[8]

a. *Section 10(b) and rule 10b–5.* Section 10(b) and rule 10b–5 forbid the employment of any "scheme or artifice to defraud," the making of any untrue statement, or engaging in any "act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Plaintiffs premise their liability claims against the title companies and banks on failure to disclose to investors material information concerning GSHL's business and the risks of its trust deed investments. Against the title companies, plaintiffs offer what they term a "global theory" of liability, as well as a "transactional theory." Under the global theory, every title company which dealt with GSHL owed a duty of disclosure to every GSHL investor; under the transactional theory, each title company owed a duty of disclosure only to investors to whom it issued title policies.

Although they do not use the same phraseology with respect to the bank defendants, plaintiffs must be asserting a global theory against them, because the banks did not deal at all with individual investors other than accepting "lock box" payments, paying on checks, and making a few, scattered individual references. Thus, plaintiffs must be asserting that any investor who suffered losses through his dealings with GSHL which can be shown to have resulted from not having material information has a right to recover from the banks because of their failure to disclose. The critical inquiry, therefore, is into the scope and nature of the title company and bank defendants' duty to GSHL investors.

In the Ninth Circuit, the analytical framework for discussions of duty to investors is provided by *White v. Abrams,* 495 F.2d 724 (9th Cir.1974). To delineate the scope of liability under rule 10b–5, the court formulated a "flexible duty standard," in which the duty owed by a defendant to a plaintiff varies according to the factual context. The trial court is to focus on the goals of the securities laws, while examining a number of factors:

> the relationship of the defendant to the plaintiff, the defendant's access to the information as compared to the plaintiff's access, the benefit that the defendant derives from the relationship, the defendant's awareness of whether the plaintiff was relying upon their relationship in

---

6. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides that it shall be unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

7. S.E.C. rule 10b–5, 17 C.F.R. § 240.10b–5, provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

8. Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), provides: "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

making his investment decisions and the defendant's activity in initiating the transaction in question.

*Id.* at 735–36 (footnotes omitted). The court concluded by sketching the opposite ends of the continuum that its flexible duty standard envisioned:

> Where the defendant derives great benefit from a relationship of extreme trust and confidence with the plaintiff, the defendant knowing that plaintiff completely relies upon him for information to which he has ready access, but to which plaintiff has no access, the law imposes a duty upon the defendant to use extreme care in assuring that all material information is accurate and disclosed.... On the other hand, where the defendant's relationship with the plaintiff is so casual that a reasonable person would not rely upon it in making investment decisions, the defendant's only duty is not to misrepresent intentionally material facts.

*Id.*[9]

The plaintiffs state that the flexible duty standard was first developed in *White* for purposes of instructing a jury, which is true. They go on to assert that the court is only to determine as a matter of law whether one or more of the five prongs of the test is met. "Once this threshold requirement is satisfied, the question of liability must be reserved to the trier of fact." Plaintiffs' Memorandum at 70. Plaintiffs offer no authority for this assertion, and it is in fact incorrect. The Ninth Circuit has affirmed summary judgments for defendants despite the presence of several of the *White* factors.

In *Kidwell ex rel. Penfold v. Meikle,* 597 F.2d 1273 (9th Cir.1979), members and directors of Targhee, an Idaho non-profit membership corporation, sued the purchaser of the corporation's assets and some of the corporation's directors and other individuals. The asset purchase transaction was alleged to be advantageous to Sioux, a sister corporation of overlapping ownership with Targhee, and unfair to the Targhee owners who were not also Sioux shareholders. The trial court gave summary judgment for all the defendants. The appellate court easily sustained the judgment as to all defendants who were not directors of Targhee. When it reached the defendants who were directors, the court applied the *White* factors. On the first factor, all nine defendants owed the duties of a fiduciary to the Targhee members, eight of them as directors, and one—Jolley—as counsel, making all of them, as the court put it, "likely candidates for disclosure." *Id.* at 1296. On access to information, again the eight directors were roughly equivalent to one another, and Jolley "had truly superior access." *Id.* All nine were made aware of Targhee's reliance on their good faith business judgment.

Thus, for all nine defendants, three of the *White* factors favored a duty to disclose. The court distinguished among the directors on the basis of which ones, in addition to the other *White* factors, stood to benefit as Sioux shareholders from the sale. The four directors who were shareholders of Sioux owed a duty to disclose that potential conflict and any other material facts. As to those four, summary judgment was reversed. The other five defendants, including Jolley, owed no such duty to disclose, despite the fact, in Jolley's case, that he had actually drafted and reviewed the sale documents and attended most of the meetings with the purchaser group. *See also Pegasus Fund, Inc. v. Laraneta,* 617 F.2d 1335

---

**9.** The *White v. Abrams* standard contemplated the possibility of liability under rule 10b–5 for negligence on the part of a defendant deriving "great benefit from a relationship of extreme trust and confidence with the plaintiff." To this extent, *White v. Abrams* is no longer good law after *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), which established that scienter is an element of a violation under rule 10b–5. In the absence of further guidance from the Supreme Court, the Ninth Circuit has held that recklessness will satisfy the scienter requirement. *Nelson v. Serwold,* 576 F.2d 1332, *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). The Ninth Circuit continues to employ the *White v. Abrams* flexible duty analysis in determining whether a defendant owes a duty to disclose material facts to a plaintiff. *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9 Cir.1979).

(9th Cir.1980) (applying *White* factors to relationship between auditors and audited firm, despite presence to some extent of several factors, only a narrow duty of disclosure is created).

The title company and bank defendants had even less to do with the investment aspects of plaintiffs' transactions than did the auditor in the *Pegasus* case or the defendants for whom summary judgment was affirmed in the *Kidwell* case. Applying the first *White* factor, the relationship between defendants and the plaintiffs did not come into existence, if at all, until after the decision to invest was made. After the trust deed deposit form was executed, plaintiffs received their title insurance policies. These policies established a fiduciary relationship of insurer and insured, but only as to the risks insured by the title policy, and only after the investment was made. The relationship between plaintiffs and their title insurers did not pertain at all to plaintiffs' other investment risks. The only possible relationship between plaintiffs and a bank defendant would be that plaintiffs received checks drawn on the banks. The references that six investors received from SNB would establish some additional relationship between those six and SNB, although not one of great substance, assuming the references were no more than standard bank references. Since plaintiffs were not among those who sought a bank credit reference, even the most damaging inference that could be drawn from those references would not assist plaintiffs. Summarizing, although the relationships between plaintiffs and those defendants with whom plaintiffs had dealings were not those of total strangers, they were much closer to that end of the *White* continuum than to the fiduciary end.

Plaintiffs try to argue that the title companies, by virtue of their work on sub-escrows, possessed material information not available to plaintiffs. They also argue that the title companies have superior access to information because of the influence and control each of them could have exerted over GSHL by "conditioning provision title [sic] or escrow services on registration compliance and disclosure." The title companies respond that the only information that they obtained relative to GSHL borrowers and their properties was what they learned from the public record. In fact, since GSHL was soliciting business from plaintiffs, plaintiffs were in a better position to seek disclosure from GSHL about borrower credit information and any other information material to plaintiffs' investment that was in GSHL's possession.

Regarding the bank defendants, plaintiffs present no evidence that the banks possessed anything more than very general knowledge about GSHL's operation, including the information obtainable from its financial statements—information presumably available to investors. The banks deny any specific knowledge about investors or properties, and plaintiffs do not effectively dispute these denials.

Title companies and banks, of course, received some modest financial benefit through their dealings with GSHL and its investors, but these were the kinds of ordinary business benefits available to any supplier of goods or services. There is no evidence that either class of defendant had any special stake in plaintiffs' investment. This is a key fact distinguishing this case from the cases relied on by plaintiffs. *Spectrum Financial Companies v. Marconsult, Inc.,* 608 F.2d 377 (9th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980) (summary judgment reversed where accounting firm produced a second, more favorable financial statement at issuer's request, knowing that its fee would not be paid unless sale of essentially worthless stock was consummated); *Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981) (summary judgment reversed for defendants, husband and son of original promoter of limited partnership, who had taken over management after her death); *Andersen v. San Francisco Securities, Inc.,* [1982] Fed.Sec.L.Rep. ¶ 98,689 (N.D.Cal.1982) (district court overruled own grant of summary judgment for firm that had played crucial role in issuance of utility district bonds, needing success and publicity

to bolster its faltering municipal financing department).

There is no evidence on the other two *White* factors: Neither banks nor title companies were aware that plaintiffs were relying on them to advise them that GSHL was selling unregistered securities and promoting risky loans both because plaintiffs were not in fact so relying and because nothing in the bank or title company relationship to GSHL or plaintiffs ever indicated that such reliance would be justified. Finally, there is no indication that bank or title company defendants initiated their relationships with plaintiffs, or sought plaintiffs' investments with GSHL.

The title company and bank defendants maintain on the basis of unrebutted deposition testimony that they did not possess any undisclosed material information. Plaintiffs, unable to present any specific facts to the contrary, fall back on the contention that the title companies and banks had a "duty to know." Even if the moving defendants had possessed such information, however, the foregoing application of the *White v. Abrams* factors demonstrates that they were under no duty to disclose it. *See also Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

b. *Section 17(a).* A private right of action under section 17(a) has only recently been recognized in the Ninth Circuit. *Stephenson v. Calpine Conifers II, Ltd., supra.* In reversing summary judgment for defendants entered on both 10(b) and 17(a) claims, the *Stephenson* court accepted, for purposes of the case, the parties' joint assumption that the substantive elements of a 17(a) action are the same as those in an action under 10(b). The court described the differences between the two as "minimal." 652 F.2d at 815.

■ The parties here have treated the liability elements of the 10(b) and 17(a) claims as coextensive with one another, and the Ninth Circuit has ruled that both sections require a showing of a duty to disclose before liability may be imposed for failure to disclose. *Feldman v. Simkins Industries, Inc.,* 679 F.2d 1299, 1305 (1982). The scien-

ter requirement is the same in the two sections, *Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 1958–59, 64 L.Ed.2d 611 (1980) (civil enforcement action); *Nelson v. Quimby Island Reclamation Dist. Facilities Corp.,* 491 F.Supp. 1364, 1382 (N.D.Cal.1980) (private damage action), as is the reliance element. *Kramas v. Security Gas & Oil Inc.,* 672 F.2d 766, 770 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).

The only potentially significant difference between the two sections is that the Supreme Court has observed in *dictum* that section 17(a) "applies only to sellers." *Aaron v. SEC, supra,* 446 U.S. at 687, 100 S.Ct. at 1950. If this is interpreted as imposing the same restriction as the "seller or offeror" criteria under section 12, then the bank and title company defendants cannot be liable under section 17(a) for the reasons stated in section II.B.1., *supra.* In fact, plaintiffs argue that there is no "strict privity" requirement under section 17(a), but they do not appear to argue that the broader "substantial factor" description of sellers would be inapplicable.

It is unnecessary to resolve this issue now. Even assuming that the "seller" limitation does not bar the application of section 17(a) to the moving defendants, the analysis of liability under sections 10(b) and 17(a) is substantially the same. Under the analysis of the preceding sub-section, the title company and bank defendants are entitled to summary judgment under section 10(b) and rule 10b–5. The same result must, therefore, obtain for section 17(a).

4. *Aiding and abetting a securities fraud.*

■ The Ninth Circuit has recently restated the elements of aider and abettor liability in a securities fraud case as follows:

(1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it;

and (3) substantial assistance in the wrong.

*Harmsen v. Smith,* 693 F.2d 932, 943 (9 Cir.1982). *Harmsen* also clarifies the distinction between a duty to disclose under the *White v. Abrams* test and the duty to disclose that pertains to aider and abettor liability. The primary violator's duty to disclose arises from his involvement with the entity whose securities are at issue and his relationship to the plaintiffs. The secondary violator's duty arises from "knowing assistance of or participation in a fraudulent scheme." *Id.* at 944 (citation omitted).

The cases indicate that "substantial assistance in the wrong" requires a significant and active, as well as knowing participation in the wrong. The performance of mere "ministerial tasks" is insufficient to establish aiding and abetting liability. In *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069 (N.D.Cal.1979), the court granted summary judgment to HKF, the accounting firm. HKF provided accounting services to the primary wrongdoer and knew from the start that his company, Capital Underwriters ("CU"), was without accounting books, that the principal, DiGirolamo, did not document adequately the funds he received, that he commingled funds raised for various partnerships, and borrowed money himself from CU. HKF prepared financial statements and tax returns for the limited partnerships, but did not knowingly prepare material for inclusion in a prospectus. Assuming for purposes of the summary judgment motion that HKF knew of or was recklessly indifferent to DiGirolamo's fraudulent activity and did nothing to halt it, the court stated that,

> HKF's services were not a substantial factor in causing the alleged 10b–5 violation. HKF had no authority to influence the affairs of CU and, had HKF quit upon learning of CU's irregular financial practices, CU could simply have hired a less astute accountant or bookkeeper.

*Id.* at 1084.

In *Feldman v. Simkins Industries, Inc.,* 492 F.Supp. 839, 847 (N.D.Cal.1980), *aff'd,* 679 F.2d 1299 (9th Cir.1982), the court made a similar point in considering allegations of aider and abettor liability against Bear, Stearns, a brokerage firm which had executed a sale of stock for defendant Simkins. The court found that Bear, Stearns did not substantially assist Simkins's disposition of the stock; it functioned solely as a broker, performing ministerial tasks which could have been done by any other brokerage house.

Assumedly, for purposes of this motion, GSHL or its principals were primary violators of section 10(b) and rule 10b–5. There is a complete void in the record as to evidence that the bank and title company defendants had *actual* knowledge of such violations. Nor can such knowledge be inferred from anything in the record. Despite deposing 17 title company and 3 bank employees, plaintiffs can do no better in controverting defendants' showing that in fact they had no such knowledge than to plead, over and over, "they must have known." This is insufficient to meet their burden under rule 56(e) of the Federal Rules of Civil Procedure. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978).

Even if the defendants could be found to have some knowledge of the primary wrongdoing, their performance of ministerial tasks in relation to the trust deed transactions is not substantial assistance to the wrongdoing. *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975) ("If the evidence showed no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws.") Missing here is any evidence that the banks and title companies sought some benefit to themselves from the consummation of GSHL's alleged fraud, which might convert silence and inaction into substantial assistance. This sets the instant case apart from those relied on by plaintiffs. *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793 (3d Cir.), *cert. denied,* 439 U.S. 430, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Carroll*

*v. First National Bank of Lincolnwood,* 413 F.2d 353 (7th Cir.), *cert. denied,* 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494.

Defendants have made a sufficient factual showing that, if unrebutted, would entitle them to a directed verdict at trial. Plaintiffs have failed to present specific facts to show that contradiction is possible either as to knowledge of the primary wrongdoing or substantial assistance to it. Defendants are, therefore, entitled to summary judgment on the aiding and abetting claim. *British Airways Bd. v. Boeing Co., supra,* 585 F.2d at 951.

5. *"Controlling person" liability.*

 Plaintiffs assert liability against the bank and title company defendants as "controlling persons" within the meaning of section 15 of the Securities Act, 15 U.S.C. § 77o, and section 20 of the Exchange Act, 15 U.S.C. § 78t(a).[10] Persons who "control" violators of section 12 of the Securities Act or section 10(b) of the Exchange Act may be held jointly and severally liable. "Control" means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." *Safeway Portland Employees Federal Credit Union v. C.H. Wagner & Co., Inc., supra,* 501 F.2d at 1124 n. 17 (quoting 17 C.F.R. § 230.405(f)).

Plaintiffs' theory—to call it "novel" would be unduly complimentary—is that the banks and title companies collectively controlled GSHL because their services were indispensable. Therefore, through a group boycott or threatened group boycott, they could have forced GSHL to mend its ways. Needless to say, plaintiffs provide the court with no authority to support this theory. Summary judgment is granted to the moving defendants as to controlling person liability.

### III. CONCLUSION

Finding no basis in fact or law to hold the banks and title companies in this action as defendants to plaintiffs' federal securities claims, the court hereby grants summary judgment on all the federal claims, and dismisses without prejudice plaintiffs' state law claims as to these defendants. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

SO ORDERED.

---

**10.** Section 15 of the Securities Act, 15 U.S.C. § 77o, provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

Section 20 of the Exchange Act, 15 U.S.C. § 78t(a), provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."